[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 98-3635
_____

D.C. Docket No. 96-00047-3-CR-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD L. GILBERT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**December 28, 1999**

Before CARNES and BARKETT, Circuit Judges, and PAINE[*], Senior District Judge.

CARNES, Circuit Judge:

_____
 [*]Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

This appeal requires us to address issues of first impression involving the Hyde Amendment, which provides for the award of attorney fees and costs to a prevailing criminal defendant who establishes that the position the government took in prosecuting him was "vexatious, frivolous, or in bad faith . . . unless special circumstances make such an award unjust." Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).

Richard L. Gilbert was convicted of fraudulently concealing assets in a bankruptcy and sentenced to 33 months imprisonment, fined $60,000, and ordered to pay $337,000 in restitution. A panel of this Court reversed the conviction, because it concluded that the statute of limitations had expired before the indictment was returned. See United States v. Gilbert, 136 F.3d 1451 (11th Cir. 1998) ("Gilbert I"). Gilbert subsequently filed a motion in the district court seeking an award of attorney fees and costs under the Hyde Amendment. After the district court denied that motion, Gilbert filed this appeal.

## I. BACKGROUND

In 1985, Gilbert was the president and sole shareholder of Corporate Air Limited, Inc. ("CAL"), a Florida corporation. On March 25, 1985, Gilbert, acting both for CAL and for its realtor, Destin Resort Properties, Inc., executed an offer to

2

purchase Robinson Island, an undeveloped island near Gulf Shores, Alabama. Because CAL did not have the money to make the down payment, it borrowed the money from two banks. In April 1985, CAL assigned the purchase contract to Isle of Fantasy, Inc. ("Isle of Fantasy"), a newly formed Florida corporation then solely owned by Gilbert. CAL wrote a check to Isle of Fantasy in the amount of $162,000 with a notation on the check indicating it was a "loan," and Isle of Fantasy used the money to purchase Robinson Island. Over the following year, CAL contributed an additional $380,000 to Isle of Fantasy for purchasing Robinson Island.

In March 1987, Gilbert filed on behalf of CAL a Chapter 11 petition seeking bankruptcy protection. He employed Charles Carter, a bankruptcy attorney, to prepare CAL's bankruptcy schedules. Carter listed the money loaned from CAL to Isle of Fantasy under the "receivables" category on the schedules. The schedules did not reveal the full extent of Gilbert's interest in Isle of Fantasy or Robinson Island, nor did they reveal that CAL had paid Gilbert money toward the purchase of Robinson Island. On December 1, 1987, the bankruptcy court converted the case to a Chapter 7 proceeding.

In December 1995, Gilbert learned that a grand jury had been convened to consider evidence regarding allegations that he concealed assets in the CAL

bankruptcy. Gilbert's counsel scheduled an appointment with the Assistant United States Attorney assigned to the investigation of Gilbert and provided a seven page single-spaced letter dated January 11, 1996, which argued, among other things, that the statute of limitations precluded any prosecution of Gilbert.

On July 18, 1996, the grand jury returned a one count indictment, charging that Gilbert fraudulently concealed assets from CAL's bankruptcy estate. Gilbert filed a motion to dismiss the indictment on the grounds that the statute of limitations had run. The district court denied Gilbert's motion to dismiss. Thereafter, in November of 1996, a jury found Gilbert guilty as charged. The court sentenced him to 33 months imprisonment to be followed by three years supervised release and fined him $60,000. The court also ordered Gilbert to pay restitution in the amount of $337,000.

Gilbert appealed and this Court reversed his conviction, holding that the statute of limitations had expired prior to his indictment. See Gilbert I, 136 F.3d 1451. Specifically, we concluded that the five-year statute of limitations had begun to run on December 1, 1987, when the bankruptcy court converted the matter involving CAL from a Chapter 11 to a Chapter 7 proceeding, and therefore the limitations period had expired on December 1, 1992, well before Gilbert was indicted in June 1996. See id. at 1455.

4

After the reversal of his conviction, Gilbert filed a motion with this Court requesting an award of attorney fees and costs pursuant to the Hyde Amendment, Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). We denied Gilbert's motion without prejudice to renewal of it in the district court. Gilbert then filed a motion for award of attorney fees and costs in the district court, which that court denied.

Now the case is back before us in Gilbert's appeal of the district court's denial of his motion for the award of attorney fees and costs under the Hyde Amendment. Gilbert contends he is entitled to such an award because the government's position in prosecuting him was "vexatious, frivolous, or in bad faith." His claim is based primarily upon his belief that: (1) the government did not have a good faith basis for charging him in light of the statute of limitations; (2) the government did not give the grand jury exculpatory evidence relating to the disclosure of his interest in Robinson Island or the statute of limitations; and (3) the government recorded criminal liens against Gilbert's property in Pinellas and Pasco counties, three months after this Court reversed his conviction and ordered the indictment dismissed.

## II. STANDARD OF REVIEW

The Hyde Amendment provides that an award of attorney fees "shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under [the Equal Access to Justice Act]." Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). Under the Equal Access to Justice Act, a denial of attorney fees is reviewed for an abuse of discretion. See Pierce v. Underwood, 487 U.S. 552, 108 S. Ct. 2541 (1988); Andrews v. United States, 122 F.3d 1367, 1374 (11th Cir. 1997). That is also the standard of review applicable to attorney fee matters generally. See American Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999). Accordingly, we will review a district court's denial of Hyde Amendment fees and costs only for an abuse of discretion. "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award [or a denial] upon findings of fact that are clearly erroneous." Id. (quoting In re Hillsborough Holding Corp., 127 F.3d 1398, 1401 (11th Cir. 1997) (internal citation and quotation omitted)).

## III. DISCUSSION

We begin our construction of the Hyde Amendment where courts should always begin the process of legislative interpretation, with the words of the statutory provision themselves. See United States  v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("In construing a statute we must begin, and often should end as well, with the language of the statute itself.") (quoting Merritt v. Dillard, 120 F.3d 1181, 1185 (11th Cir. 1997)).

## A. The Statutory Language

The Hyde Amendment was enacted as part of P.L. 105-119, the $31.8 billion Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, and is found as a statutory note to 18 U.S.C. § 3006A.  It provides as follows:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or

7

testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) (emphasis added). The key language requires a successful criminal defendant to establish that the position the government took in the prosecution was "vexatious, frivolous, or in bad faith." Those words are not defined in the statute, so they "must be given their ordinary meaning." Chapman v. United States, 500 U.S. 453, 462, 111 S. Ct. 1919, 1925 (1991).

"Vexatious" means "without reasonable or probable cause or excuse." Black's Law Dictionary 1559 (7th ed. 1999); see also Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S. Ct. 694, 700 (1978) (describing "vexatious" conduct in the Title VII context as being "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith"). A "frivolous action" is one that is "[g]roundless ... with little prospect of success; often brought to embarrass or annoy the defendant." Black's Law Dictionary 668 (6th ed. 1990); see also Fed. R. Civ. P. 11. Finally, "bad faith" "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind

8

affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed. 1990); see also Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978) (defining bad faith in the law enforcement context to include "reckless disregard for the truth").

From the plain meaning of the language Congress used, it is obvious that a lot more is required under the Hyde Amendment than a showing that the defendant prevailed at the pre-trial, trial, or appellate stages of the prosecution. A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct – a prosecution brought vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous.

## B. The Legislative History of the Hyde Amendment

Given the plain meaning of the statutory language, we could bypass any consideration of legislative history. See Steele, 147 F.3d at 1318. "Nevertheless, for the sake of completeness," McNely v. Ocala Star-Banner Corp., 99 F.3d 1068, 1074 (11th Cir. 1996), and because this is our first occasion to decide a Hyde Amendment case, [1] we will look at that history. The legislative history of the

---

[1] With the exception of a Tenth Circuit opinion construing the time period for appeal, see United States v. Robbins, 179 F.3d 1268, 1270 (10th Cir. 1999) ("Because an appeal under the 'Hyde Amendment' arises out of a criminal case, Fed. R. App. P. 4(b) applies and litigants must file a notice of appeal within the 10 days after the order appealed from is entered."), no other circuit court of appeals has construed any provision of the Hyde Amendment in a published opinion.

provision is far from extensive, but that which does exist reinforces the narrowness of scope described by the plain meaning of the language used.

The legislative undertaking that would lead to the Hyde Amendment began because some members of Congress were upset over the prosecution of one of their friends and former colleagues, Joseph McDade, who after a lengthy investigation was tried and acquitted in 1996 of federal bribery and racketeering charges.  See Elkan Abramowitz & Peter Scher, The Hyde Amendment: Congress Creates a Toehold for Curbing Wrongful Prosecution, 22 Champion, Mar. 1998, at 23.  In response to the prosecution of McDade, in 1997 Representative John Murtha offered an amendment to an appropriations bill which would have provided reimbursement to members of Congress and their staffs who successfully defend themselves against a federal criminal prosecution.  See id.  Representative Henry Hyde, Chairman of the House Judiciary Committee, was sympathetic to the Murtha's proposal, and apparently shared much of his motivation, because in discussing the measure on the floor of the House, Hyde referred to "someone we all know who went through hell, if I may use the term, for  many years of being accused and finally prevailed at enormous expense."  143 Cong. Rec. H 7786-04, H7791 (Sept 24, 1997).  Hyde, however, thought that  Murtha's proposal was too

10

narrow, because it was limited to members of Congress and their staff. He pointed to the case of former Secretary of Labor Ray Donovan, "who was prosecuted and again and again and again and won every time." Id. at H7792. Acknowledging that it might be impossible for someone in that situation ever to regain their reputation, Hyde declared "at least, if the Government tries to bankrupt someone because of attorney fees, they ought to pay that." Id.

Representative Hyde offered his own appropriations bill amendment, which was not limited in its coverage to members of Congress and their staff, but instead extended to all federal criminal defendants. In addition, Hyde patterned his amendment after the Equal Access to Justice Act ("EAJA"), see 28 U.S.C. § 2412(d)(1)(A), which authorizes the award of attorneys' fees and costs to private parties who prevail against the government in civil actions unless the government establishes that its position was "substantially justified." See 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde). Thus, in its original form the Hyde Amendment would have allowed the award of attorney fees and costs to any federal criminal defendant who prevailed against the government,

unless the government showed that its position in the prosecution had been

"substantially justified." [2]

Representative Hyde described the type of prosecutorial misconduct at

which his proposal was aimed as follows:

> What if Uncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong. They keep information from you that the law says they must disclose. They hide information. They do not disclose exculpatory information to which you are entitled. They suborn perjury. . . . [U]nder my amendment . . . , [if the government] cannot prove substantial justification after the case is over, and the verdict is not guilty, then the prosecution pays something toward the attorney's fees of the victim.

Id.

Representative Hyde's proposed amendment drew opposition.

Representative David Skaggs criticized Hyde for offering the amendment without

---

[2] The full text of Representative Hyde's initial amendment was as follows:

> During fiscal year 1997 and in any fiscal year thereafter, the court, in any criminal case pending on or after the date of the enactment of this Act, shall award, and the United States shall pay, to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation costs, unless the court finds that the position of the United States was substantially justified or that other special circumstances make an award unjust. Such awards shall be granted pursuant to the procedures and limitations provided for an award under section 2421 of title 28, United States Code. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriation shall be made as a result of this provision.

143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde) (emphasis added).

12

the benefit of formal hearings which would have allowed  the Department of Justice or the criminal defense bar to comment on its provisions, and also criticized the provision itself for failing to require that the government's conduct be "malicious" or "abusive".  See 143 Cong. Rec. H7786-04, H7791-92 (Sept. 24, 1997) (statement of Rep. Skaggs).  Skaggs noted  that the rigorous standard for a finding of frivolousness outlined by Hyde in his remarks on the floor (which we have quoted above) was lacking from the amendment itself.  See id. at H7792.  He said: "Were the words 'malicious' and 'abusive' in his amendment, and maybe those are criteria [that] ought to be introduced, it would be a different matter. Those were not standards that are in [Representative Hyde's] amendment although they were certainly the standards invoked in his rhetoric."  Id.  Another Representative criticized the amendment for its potential "chilling effect" on federal prosecutions, especially in regard to crimes where the government has to rely on witnesses who often are reluctant to testify, such as child abuse and pornography.  Id. at  H7793 (statement of Rep. Rivers).

The Clinton Administration was even more forceful in opposing the Hyde Amendment in its original form. In a statement of policy read on the House floor, the administration charged that authorizing the award of fees and costs unless the government proved substantial justification "would have a profound and harmful

13

impact on the Federal criminal justice system." Id. at H7792. It also warned that the measure would "create a monetary incentive for criminal defense attorneys to generate additional litigation in cases in which prosecutors have in good faith brought sound charges, tying up the scarce time and resources that are vital to bringing criminals to justice." Id.

In addition, the Department of Justice publically contended that the Hyde Amendment would unnecessarily deplete prosecutorial and judicial resources by forcing the government to litigate its "justification" following an acquittal. See Elkan Abramowitz, The Hyde Amendment and Wrongful Federal Prosecutions, N.Y.L.J., Jan. 6, 1998, at 3. It argued that allowing courts to second guess prosecutions and diverting the Department's limited resources, would discourage prosecutors from pursuing legitimate charges. See Mark Johnson, Reimbursement Bill Opposed by Top Prosecutors, Tampa Trib., Nov. 3, 1997, at 3. [3]

Notwithstanding the opposition, the House did approve the Hyde Amendment to the appropriations bill, by a vote of 340 to 84. See 143 Cong. Rec. H7849-01, H7849 (Sept. 25, 1997). Even though the bill provided the Department

---

[3] Representative Hyde felt the heat. As Hyde stated in an interview, "I got all kinds of opposition from the administration. [House Speaker] Newt [Gingrich] was dismissive of it, [Senate Majority Leader] Trent [Lott] was dismissive of it. . . . They were both apparently bothered by veto threats by the [P]resident." See T.R. Goldman, Spending Bill Alters Legal Landscape, Legal Times, Nov. 17, 1997, at 1.

14

with a billion dollar increase in appropriations over the prior year, <u>see</u> T.R.

Goldman, <u>Spending Bill Alters Legal Landscape</u>, Legal Times, Nov. 17, 1997, at 1,

the Attorney General warned Congress that the Department of Justice would urge

the President to veto the entire appropriations bill if it contained the Hyde

Amendment.  <u>See</u> Harvey Berkman, <u>The Wrongly Prosecuted May Get Legal Fees</u>

<u>Help</u>, The Nat'l L.J., Nov. 24, 1997, at A10.  The Senate chose not to adopt the

Hyde Amendment, passing the appropriations bill without it.

Faced with the Department of Justice's fierce opposition to the Hyde

Amendment and the possibility of a presidential veto, the Conference Committee

compromised and watered down the provision.  The Committee initially replaced

the standard that had been borrowed from the EAJA and which required fees

unless the government could show that its position was "substantially justified"

with one of the standards governing the payment of attorney fees found in the

Firearms Owners' Protection Act of 1986 ("the Firearms Act"), <u>see</u> 18 U.S.C. §

924(d)(2)(B). [4]  Under that standard a prevailing party may recover attorney fees

---

[4]  That provision, 18 U.S.C. § 924(d)(2)(B), reads:

 In any other action or proceeding under the provisions of this chapter, the court,
 when it finds that such action was without foundation, or was initiated
 vexatiously, frivolously, or in bad faith, shall allow the prevailing party, other
 than the United States, a reasonable attorney's fee, and the United States shall be
 liable therefor.

only if the court finds that the government's "action was without foundation, or was initiated vexatiously, frivolously, or in bad faith." § 924(d)(2)(B). Unlike the Firearms Act standard, however, the proposed compromise standard vested discretion in the court not to award attorney fees even where that standard was met if "the court finds that special circumstances make such an award unjust." Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).

Although the Department of Justice had suggested the Firearms Act standard, some members of Congress were still concerned that standard would be too easy to meet. In response to their concern, two changes were made to the language before the Conference Committee reported it out. One was that the burden of making the requisite showing was put on the prevailing criminal defendant instead of the government. This change was effected by language expressly disavowing the burden of proof contained in the EAJA. As modified, the provision stated that "[s]uch awards [of attorney fees and expenses] shall be granted pursuant to the procedures and limitations (but not the burden of proof)

---

18 U.S.C. § 924(d)(2)(B).

Although there is little case law on the Firearms Act, the "bad faith, without foundation, vexatiously or frivolously" language permits recovery "only in very limited, specifically articulated instances." See United States v. Fourteen Various Firearms, 899 F. Supp. 249, 253 (E.D. Va. 1995).

provided for an award under [the EAJA]." Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) (emphasis added); see generally Pierce v. Underwood, 487 U.S. 552, 108 S. Ct. 2541 (1988) (indicating that the government has the burden of proof under the EAJA to show that its position was substantially justified).

The other modification the Conference Committee made was to narrow the scope of the Hyde Amendment by deleting from its description of prosecutions which would justify an award those that were brought "without foundation." See T.R. Goldman, Spending Bill Alters Legal Landscape, Legal Times, Nov. 17, 1997, at 1; H.R. Conf. Rep. No. 104-405, at 193-94 (1997), reprinted in 1997 U.S.C.C.A.N. 2941, 3044-45. The effect was to require a criminal defendant seeking fees to show more than that the prosecution had been without foundation. The "more" a defendant would be required to show is reflected in the final language of the provision, as it was enacted into law, which provides that attorney fees may be awarded where "the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special

circumstances make such an award unjust." Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). [5]

So, in response to concern that the initial version of the Hyde Amendment swept too broadly, the scope of the provision was curtailed significantly. The version enacted into law does not permit the award of fees to a prevailing criminal defendant whenever the government fails to show that its position was "substantially justified." Instead, a successful defendant must show that the government's position was "vexatious, frivolous, or in bad faith," and even then may not recover if there are special circumstances which make the award of fees unjust. The plain language, reinforced by the legislative history of the provision, places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges.

### C. Application of the Hyde Amendment to this Case

_____

[5] In calling up the Conference Report on the floor of the House, one of the conferees, Representative Rogers, summarized the changes in the Hyde Amendment language, as follows:

> On the Hyde provision, we have language that we believe is acceptable to all parties, that allows the recovery of attorneys' fees in criminal cases where the defendant is acquitted where the court finds that the prosecutor acted vexatiously, frivolously or in bad faith.

143 Cong. Rec. H10918-07, H10919 (Nov. 13, 1997). The Conference Report itself had little to say on the subject, but it did note that: "The conferees understand that a grand jury finding of probable cause to support an indictment does not preclude a judge from finding that the government's position was vexatious, frivolous or in bad faith." 143 Cong. Rec. H10809-01, H10863 (Nov. 13, 1997).

18

Gilbert's argument that the government's position in prosecuting of him was "vexatious, frivolous, or in bad faith" has three primary prongs. [6] First, he contends that the prosecution should never have been brought, because the statute of limitations had run before his case was ever presented to the grand jury. His contention in this regard is supported by the fact that before Gilbert was indicted his attorney communicated Gilbert's position concerning the statute of limitations to the Assistant United States Attorney handling the case, a position that was ultimately vindicated by this Court's decision in Gilbert I. However, in order to be eligible for fees and costs under the Hyde Amendment a successful defendant must show more than he was ultimately successful in defending against the charges brought, and that is true whether the basis of his successful defense is factual, or as in this case legal. To be eligible for fees as a result of having prevailed on a legal defense, the defendant must show that the government's legal position was either asserted in bad faith or without any foundation or basis for belief that it might prevail. Gilbert has not shown that here.

---

[6] In addition to the three primary prongs of Gilbert's argument, which we discuss at more length in the text, he also argues that he should be awarded fees and costs because the Chapter 7 trustee and the United States Attorney's Office conspired and combined to use the "in terrorem" effect of a criminal prosecution as a substitute for an unsuccessful civil proceeding. Suffice it to say that Gilbert has failed to demonstrate an adequate basis in the record for this argument.

The question of when the statute of limitations begins to run in a 18 U.S.C. § 152 fraudulent concealment case was an issue of first impression in this circuit at the time Gilbert was indicted and convicted and up until the time we released our decision in his appeal in Gilbert I. Before then we had never addressed that issue in any factual situation. Moreover, although some circuits had addressed the issue in other factual situations, see, e.g., United States v. Dolan, 120 F.3d 856 (8th Cir. 1997); United States v. Guglielmini, 425 F.2d 439 (2d Cir. 1970), before our decision in Gilbert I there had never been a decision anywhere in the country addressing the specific issue of when the statute of limitations begins to run in a § 152 case where a Chapter 11 proceeding has been converted to Chapter 7. We do not charge criminal defense attorneys with the duty of foreseeing future developments in the law. See Tarver v. Hopper, 169 F.3d 710, 714 (11th Cir. 1999); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994). Likewise, we will not hold that prosecutors act in bad faith when they fail to anticipate how a court will decide an issue of first impression.

In prosecuting crime, government attorneys are entitled to be zealous advocates of the law on behalf of their client, the people of the United States. While a prosecutor is not at liberty to strike foul blows, he may strike hard ones, and "[h]e may prosecute with earnestness and vigor – indeed, he should do so."

20

Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935).  Allowing fees and costs against the Department of Justice when a conviction is reversed on a legal  issue of first impression in the circuit would chill the ardor of prosecutors and prevent them from prosecuting with earnestness and vigor.  The Hyde Amendment was not intended to do that.  Indeed, as we have seen, the original wording of that provision was modified during the legislative process in order to prevent it from having a chilling effect on legitimate prosecutions, even those which ultimately result in acquittals.  See pp. 13-14, above.

Even in its earliest form, the Hyde Amendment was targeted at prosecutorial misconduct, not prosecutorial mistake.  Representative Hyde spoke in terms of the government "keep[ing] information from [the defendant] that the law says [the government] must disclose," " hid[ing] information," "not disclos[ing] exculpatory information," and "suborn[ing] perjury" -- all clear examples of prosecutorial misconduct.  143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997).  The changes to the amendment in the Conference Committee illustrate Congress' intent to limit its scope.  The substitution of the narrower language of "vexatious, frivolous, or in bad faith" in place of the broader language about lack of substantial justification, the removal of the phrase "without foundation," and the shifting of the burden of proof to the movant all show that Congress meant to sanction and deter

21

prosecutorial misconduct, not prosecutorial zealousness per se.  See generally

United States v. Ranger Electronic Communications, Inc., 22 F. Supp. 2d 667

(W.D. Mich. 1998) (holding that violation of Brady doctrine was example of bad

faith justifying award of fees under the Hyde Amendment).

A defendant seeking Hyde Amendment fees and costs on the basis of a legal

position the government took in prosecuting him  must establish that the position

was foreclosed by binding precedent or so obviously wrong as to be frivolous.

Gilbert has not established that and he can not establish it.  He is effectively

foreclosed from doing so not only because a legal issue of first impression in this

circuit was involved, but also by the fact that the district judge who presided at his

trial accepted the government's statute of limitations position, the same position

this Court later rejected in Gilbert I.[7]  Once a district court judge accepts the

government's legal position it will be extremely difficult to persuade us that the

issue was not debatable among reasonable lawyers and jurists, i.e., that it was

frivolous.

The second prong of Gilbert's argument that the government's position in

prosecuting him was "vexatious, frivolous, or in bad faith" is based on his

---

[7] It is worth remembering that we exercise de novo review of legal issues and it was on that basis we reversed the district court's ruling on the statute of limitations issue in Gilbert I. See Gilbert I, 136 F.3d at 1453.  We certainly did not find that the district court's (also the government's) contrary view on that legal issue was frivolous.

22

contention that the government withheld exculpatory evidence from the grand jury. We accept for present purposes Gilbert's allegation that certain information and evidence favoring him was not disclosed to the grand jury, but in doing so we also accept his concession that all of the information and evidence he says should have been disclosed to the grand jury was in fact presented to the trial jury which nonetheless convicted him.

To begin with, it is settled law that the prosecution is not required to include exculpatory evidence in its presentation to the grand jury. See United States v. Williams, 504 U.S. 36, 51, 112 S. Ct. 1735, 1744 (1992) ("[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). The obligation to disclose exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), applies only in regard to trials, see Flores v. Satz, 137 F.3d 1275, 1278 (11th Cir. 1998), and there is no Brady violation except where there is a reasonable probability that non-disclosure would change the result of the trial, see Strickler v. Greene, 119 S. Ct. 1936, 1948 (1999). In this case, we know that the failure to disclose the information and evidence in question to the grand jury did not change the result of the trial, because with full

knowledge of it the trial jury found beyond a reasonable doubt that Gilbert was guilty as charged in the indictment returned by the grand jury.

Nothing in the text or legislative history of the Hyde Amendment indicates that Congress intended to modify the law relating to discovery in criminal cases, to expand the Brady doctrine, or to categorize as prosecutorial misconduct actions which clearly were not misconduct under existing law. Failing to disclose to the grand jury exculpatory evidence is not a basis for concluding that the government's position in an underlying prosecution was "vexatious, frivolous, or in bad faith," at least not where, as here, the trial jury convicts with knowledge of that evidence.

The third prong of Gilbert's argument that the government's position in prosecuting him was "vexatious, frivolous, or in bad faith" concerns actions he claims the government took after he won the appeal in Gilbert I and the mandate was issued to the district court requiring dismissal of the indictment. He says that three months after that happened, the government filed a lien on his house and other property that he had mortgaged as security for the $397,000 bond he had been required to post in order to remain free pending appeal of his conviction. In other words, although the need for the security on his bond was mooted once we reversed Gilbert's conviction and the indictment was dismissed, he alleges that the government nevertheless filed a lien on his property thereafter.

24

If Gilbert's allegations were supported in the record, we would certainly insist upon an explanation from the government, and then we would decide whether that conduct fell within the scope of the Hyde Amendment. We need not decide that issue, however, because there is nothing in the record to support Gilbert's allegations in this respect. He did not raise the matter in the district court, no evidence was put in the record concerning it, and we have only the assertions in Gilbert's brief about it. Even if the issue had been raised in the district court, "[u]nsupported assertions in a brief cannot substitute for evidence in the record." See Barnes, 168 F.3d at 436. Accordingly, because Gilbert did not raise this argument in the district court and there is no evidence in the record to support it, we will not consider it on appeal. See id. at 435. [8]

## III. CONCLUSION

Because Gilbert has not met his burden under the Hyde Amendment of showing that the government's position was "vexatious, frivolous, or in bad faith," the district court's denial of his motion for attorney fees and costs is AFFIRMED.

---

[8] Gilbert argues he was not aware that the government had filed a lien when he submitted his motion for attorney fees and costs in the district court, and therefore he should not be subject to the rule precluding appellate review of arguments not raised in the district court. But litigation must proceed in an orderly fashion and be brought to an end. We will not prolong cases by remanding for presentation of new claims and arguments whenever a litigant claims to have discovered some new support or basis for his case, at least not where a litigant has not even attempted to supplement the record on appeal through Federal Rule of Appellate Procedure 10(e).