[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 2, 2012
JOHN LEY
CLERK

_____

No. 09-12129

_____

D. C. Docket No. 08-20112-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

ANDREA G. HOFFMAN,
SEAN PAUL CRONIN,

Interested-Parties-Appellants,

versus

ALI SHAYGAN,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 2, 2012)

**ON PETITION FOR REHEARING EN BANC**

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR, and MARTIN, Circuit Judges.[*]

BY THE COURT:

The court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure), the Suggestion of Rehearing En Banc and the Petition for Rehearing are **DENIED.**

/s/ JOEL F. DUBINA

CHIEF JUDGE

---

[*]Judge Adalberto Jordan did not participate in the en banc poll.

MARTIN, Circuit Judge, dissenting from the denial of rehearing en banc, in which BARKETT, Circuit Judge, joins:

Prosecutors perform a vital and laudatory role for our society. To help them carry out this role, we give them enormous power. This, even to such an extent that they have authority to decide whether our government will seek to take the life of a given criminal defendant. Our federal prosecutors are taught—and often reminded—that the "interest" of the United States "in a criminal prosecution is not that it shall win a case, but that justice shall be done." Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999) (quotation marks omitted). My observation is that prosecutors almost always do their job so as to bring honor to the remarkable criminal justice system that is ours. At the same time, our system of government is one of checks and balances, and no public official was intended to have power without end.

In 1997, Congress enacted just such a check on prosecutors in a statute commonly referred to as the Hyde Amendment. The legislation was widely understood to be Congress's response to the prosecution of former Congressman Joseph McDade, who had served seventeen terms in Congress. After a lengthy federal investigation and trial, a jury acquitted Mr. McDade. During the development of that legislation, Congressman Henry Hyde, then Chairman of the

3

House Judiciary Committee, referred to "someone we all know who went through hell, if I may use the term, for many years of being accused and finally prevailed at enormous expense, one he will never get out from under."  143 Cong. Rec. H7786-04, at H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Henry Hyde, Chairman, H. Comm. on Judiciary).  In that same discussion, Congressman Hyde described the concerns motivating the law which bears his name:

> What if Uncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong.  They are not just wrong, they are willfully wrong, they are frivolously wrong.  They keep information from you that the law says they must disclose.  They hide information.  They do not disclose exculpatory information to which you are entitled.  They suborn perjury.

Id.  As it was ultimately passed, the Hyde Amendment permits federal courts to award reasonable attorneys fees to criminal defendants who are acquitted if "the position of the United States was vexatious, frivolous, or in bad faith."  Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).  Thus, we in the judicial branch were given our own role to play in this system of checks and balances to protect against prosecutorial misconduct.

The trial judge in this case performed his assigned role with great care.  U.S. District Judge Alan S. Gold's comprehensive fifty-page Order awarding Hyde

4

Amendment attorneys fees to Dr. Ali Shaygan was "crowded with thorough findings of fact" detailing government misconduct that took place in his prosecution. United States v. Shaygan, 652 F.3d 1297, 1321 (11th Cir. 2011) (Edmondson, J., concurring in part and dissenting in part). Judge Gold entered his exhaustive Order after (1) shepherding the case through the more than fifteen months between the time when Dr. Shaygan was indicted, until this appeal was filed; (2) presiding over the four-week jury trial of Dr. Shaygan which culminated in the jury acquitting the doctor of all 141 counts in the indictment, after a mere three hours of deliberation, see United States v. Shaygan, 661 F. Supp. 2d 1289, 1291 (S.D. Fla. 2009), and (3) presiding over an extensive two-day evidentiary hearing held after the acquittal, on Dr. Shaygan's motion seeking relief under the Hyde Amendment, see id.

This Court's opinion disputes none of Judge Gold's findings of misconduct by the prosecutors, but relieves them of all sanctions imposed, holding that sanctions were not permitted as a matter of law. Specifically, the opinion holds that so long as a prosecutor has a good faith basis for charging a defendant in the first place, any prosecutorial misconduct that follows is immune from sanction

under the Hyde Amendment.  See Shaygan, 652 F.3d at 1317.[1]  To get to this result, the opinion rewrites the statute by limiting the term "the position of the United States" to mean only the basis for bringing charges.  The statute will now be enforced in our Circuit in a way that places precisely the type of prosecutorial misconduct Congressman Hyde highlighted as motivating passage of the Hyde Amendment beyond its scope.  This Court's opinion also strips our federal trial judges of a rarely needed, but critical tool for deterring and punishing prosecutorial misconduct.  And the prosecutorial misconduct that happened in Dr. Shaygan's case deserved punishment.

## I.

Dr. Shaygan was a medical doctor practicing in Miami.  Prosecutors from the U.S. Attorney's Office in the Southern District of Florida sought, and the Grand Jury returned, a twenty-three count indictment charging Dr. Shaygan with distributing controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1).  Shaygan, 661 F. Supp. 2d at 1293.  The indictment also charged that Dr.

---

[1] The opinion does devise a single exception to this rule.  Where a prosecutor uses a constitutionally impermissible factor—such as race or religion—in deciding to bring charges, the opinion permits Hyde Amendment sanctions even if the charges are supported by probable cause.  See Shaygan, 652 F.3d at 1312–13.  I find the basis for this lone exception nowhere in either the text of the Hyde Amendment or the statute's legislative history.

Shaygan's improper prescribing practices resulted in the death of one of his patients. Id. Judge Gold found that the bringing of the original indictment was "not frivolous or commenced in bad faith." Id. at 1321. However, the prosecution of Dr. Shaygan ran into problems, and the prosecutors responded with tough tactics that deteriorated into disobeying Court Orders, hiding evidence, and shirking the longstanding obligations imposed upon federal prosecutors by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), and the Jencks Act, 18 U.S.C. § 3500.

Early on in his prosecution, Dr. Shaygan refused to withdraw his ultimately successful motion to suppress certain statements taken from him by investigators in violation of his Miranda rights. The prosecutors responded by taking their case against Dr. Shaygan back to the Grand Jury, to get a Superseding Indictment which added, by my count, 118 counts to the original charges. Shaygan, 661 F. Supp. 2d at 1298. This is the path by which the jury was ultimately presented with a 141-count indictment against Dr. Shaygan. As I have said, the jury quickly acquitted him of every count.

Judge Gold's Order tells of how it came to pass that prosecutors enlisted two of their most important witnesses, Carlos Vento and Trinity Clendening (former patients of Dr. Shaygan), to secretly record conversations with Dr.

Shaygan's lawyers and their investigator. The lead prosecutor promoted these surreptitious recordings based on a report he got from his own investigator, an agent of the Drug Enforcement Agency (DEA). The DEA agent reported that a third prosecution witness, another patient named Courtney Tucker, was "going south" and "showing signs of reluctance" about testifying against Dr. Shaygan. Id. at 1301. The DEA agent advised that Ms. Tucker was wary of cooperating with the government in Dr. Shaygan's case, because she feared the government would portray her as a drug addict during her testimony at Dr. Shaygan's trial and might even prosecute her in the future. See id. at 1300. Based on this report, the lead prosecutor concluded that Dr. Shaygan's lawyers were behind Ms. Tucker's reluctance to testify and were engaging in "witness tampering." See id. at 1302. He instituted the secret recordings to investigate. Id.[2]

Among the problems with this premise for the surreptitious recording of the defense team is that the defense team never did say these things to Ms. Tucker,

---

[2] This was not the first allegation of witness tampering made by these very prosecutors related to Dr. Shaygan's defense team. These same two prosecutors earlier brought a case against Evelio Cervantes Conde, which resulted in Mr. Conde being acquitted. See United States v. Conde, No. 07-cr-20973 (S.D. Fla. July 18, 2008) (entering judgment of acquittal). Mr. Conde was represented by Mark Seitles, who later became one of Dr. Shaygan's lawyers. After the Conde acquittal, the two prosecutors filed a criminal complaint against Mr. Conde, charging him with witness tampering. Shaygan, 661 F. Supp. 2d at 1293. Mr. Seitles contested the charge with supervisors in the U.S. Attorney's Office, and the witness tampering case against Mr. Conde was dropped without an indictment. Id.

and neither did Ms. Tucker ever tell the DEA agent that they had. See id. at 1299. On this point, Judge Gold heard testimony from all involved, and made a finding that Ms. Tucker did not tell the DEA agent that anyone from the defense team had ever warned her that she would be subject to federal prosecution or that the government would attempt to portray her as a drug addict. Id. Judge Gold credited Ms. Tucker's testimony that the defense team never tried to intimidate her. Id. Indeed, the evidence indicated that it was the government that fabricated Ms. Tucker's purported bad statements about Dr. Shaygan when it included things Ms. Tucker did not say in the DEA-6 report (DEA-6). See id. at 1298.

Once the ball got rolling on this baseless "witness tampering" investigation, the detour from the path to justice veered further. The government identified Mr. Vento and Mr. Clendening to the defense team as merely former Shaygan patients who would serve as neutral witnesses to the facts of the case. In truth, the lead prosecutor directed that Mr. Vento and Mr. Clendening be enlisted to record any conversations they might have with Dr. Shaygan's defense team, see id. at 1304, and Mr. Vento was provided with a recording device for that purpose, id. at 1305. Within a few days, Mr. Vento secretly recorded a conversation with Michael Graff, who was the investigator working for Dr. Shaygan's lawyers. Id. Later, at the government's request, but using his own equipment, Mr. Clendening secretly

9

recorded his conversation with David Markus—one of Dr. Shaygan's lawyers. See id. at 1308. These recordings were kept secret from the defense team and the District Court.

The prosecutors violated direct Orders of the Court. Judge Gold ordered the government to give him all DEA-6s so that he could review them, in camera, before the trial began. See id. at 1300–01. Even so, the prosecutors did not turn over the DEA-6 which reported that Mr. Vento had recorded his conversation with Mr. Graff and also documented the DEA agent's interview of Ms. Tucker. See id. at 1306. Neither did the government provide any DEA-6 which reported that Mr. Clendening had recorded his conversation with Mr. Markus. See id. at 1310 (noting the prosecutor "did not disclose that he knew Clendening, who testified for the Government after Vento, was working with [the DEA agent] and that he had agreed to make recordings"). Also not produced was the "crucial DEA-6" reflecting that Mr. Vento had entered into a confidential informant agreement with the government on January 16, 2009. Id. at 1309.[3] As Judge Gold noted, if these DEA-6 reports had been produced to him as he had ordered, Dr. Shaygan and the

---

[3] Dr. Shaygan's trial began on February 17, 2009. The fact of Mr. Vento's January 16, 2009 confidential informant agreement with the government was not written in the form of a DEA-6 until March 3, 2009, which was during the trial, and after the defense had already learned about Mr. Vento's recording of Mr. Graff. See Shaygan, 661 F. Supp. 2d at 1309.

Court would have known about the recording of the defense team, and that Mr. Vento and Mr. Clendening were serving as DEA informants, instead of appearing as neutral witnesses. See id. at 1317.

Beyond these violations of the Court's Orders, the prosecutors also violated their duties under Brady, Giglio and the Jencks Act.[4] For example, the prosecutors knew of information given by Dr. Shaygan's patients that was favorable to him, but withheld it. See id. at 1317–18. This was important because it went directly to the prosecution's theory that Dr. Shaygan was not a legitimate doctor. See id. at 1318. Giglio was violated, for example, when the prosecution never disclosed to Dr. Shaygan that it had contacted a Florida prosecutor on behalf of Mr. Clendening—who was facing felony drug charges in Florida state court—to communicate that Mr. Clendening had been assisting the federal government in its efforts to prosecute Dr. Shaygan. See id. at 1309. The government violated the

---

[4] Judge Gold's fifty-page Order makes so many findings that it is not practical to set them all out here. Beyond what is set out in the main text of this dissent, Judge Gold delineated his findings of (1) instances in which the prosecutors offered live testimony which varied from their own written affidavits previously given to the Court, see Shaygan, 661 F. Supp. 2d at 1302, 1306; (2) instances in which various members of the U.S. Attorney's Office and law enforcement agents gave differing accounts of the same events, see id. at 1302; (3) policies of the U.S. Attorney's Office regarding investigations of opposing counsel being violated, see id. at 1303–04; and (4) members of the U.S. Attorney's Office "casually" discussing with a group of people at dinner, the fact that while he was testifying during Dr. Shaygan's trial, Mr. Clendening blurted out that he had recorded his conversation with Dr. Shaygan's lawyer, when no member of the prosecution had ever disclosed the existence of these recordings to the Court, see id. at 1312–13.

11

Jencks Act, when it possessed recorded statements of Mr. Vento and Mr. Clendening speaking to members of the Shaygan defense team, but did not turn over those statements in connection with Vento and Clendening's testimony at trial. See id. at 1319–20. All this the government failed to do even in the face of specific defense requests for Brady, Giglio and Jencks material, and a standing Court Order to produce it.

## II.

As with the factual inquiry, Judge Gold diligently undertook the responsibility imposed on him by the Hyde Amendment to determine whether this misconduct by the government amounted to a position that was vexatious, frivolous or in bad faith. As I have said, he made findings after hearing oral testimony and receiving written affidavits from all involved. He found generally that the two Shaygan prosecutors "exhibited a pattern of 'win-at-all-cost' behavior . . . that was contrary to their ethical obligations as prosecutors and a breach of their 'heavy obligation to the accused.'" Id. at 1315. Judge Gold's finding in this regard was supported by countless evidentiary details which cannot all be restated here. I will only briefly summarize.

Among Judge Gold's specific findings of bad faith was his finding that the lead prosecutor undertook the surreptitious recordings in the so-called witness

12

tampering investigation "for the bad faith purpose of seeking to disqualify the defense lawyers for conflict-of-interest immediately prior to trial." Id. at 1310. Judge Gold found that the lead prosecutor knew that if key defense lawyers for Dr. Shaygan could be disqualified just before the trial, they would have to step down immediately. See id. at 1311. That "catastrophic" blow, it was hoped, would "force" Dr. Shaygan to plead guilty. Id.

Judge Gold also undertook an extensive discussion of how the lead prosecutor failed to follow either the policies of his U.S. Attorney's Office or the specific instruction given him to remove himself from the investigation he had initiated against opposing counsel. Noting how the strict "taint wall" between the Shaygan prosecution and the investigation of Dr. Shaygan's defense team had been repeatedly breached for "tactical" purposes, id. at 1311, Judge Gold found that the lead prosecutor acted with "implicit bias and in bad faith" in this regard as well. Id. at 1302.

Judge Gold drew a "strong inference[]" that the Superseding Indictment adding 118 counts to the twenty-three counts of the original indictment was "significantly motived by ill-will." Id. at 1298. Judge Gold found that the addition of so many charges was designed to compel a guilty plea from Dr. Shaygan by "greatly increas[ing] the time and cost of the trial" and by delaying the

trial so as to prolong the "strict conditions of house arrest" which were exacting a heavy psychological toll on Dr. Shaygan. Id.

Finally, Judge Gold found that the prosecution's failure to turn over the DEA-6 documenting that Mr. Vento had recorded the defense team was "knowing and in bad faith." Id. at 1306. He found that the prosecution's failure to turn over the DEA-6 report of the interview of Ms. Tucker was "willful, vexatious and in bad faith." Id. at 1301. These actions and many others, Judge Gold concluded, were "conscious and deliberate wrongs" arising from "the prosecutors' moral obliquity." Id. at 1321. And far from isolated wrongs, he emphasized, they fit into a "pattern" of desperate conduct designed to save a case that had become weak from getting even weaker. See id. at 1315, 1322.

### III.

As I have said, this Court's opinion in Shaygan does not dispute that the prosecutors did or said everything that Judge Gold found to be true. Neither does it contest Judge Gold's findings that the prosecutors acted in violation of their ethical obligations as representatives of our government. Rather, the opinion assumes that the only factor that reflects the position of the government (other than the narrow exception I have mentioned) is the basis for the charges against the defendant. See Shaygan, 652 F.3d at 1311–16. This astoundingly narrow

14

reading of the term "the position of the United States" collapses the Hyde Amendment inquiry into only a single question: were the charges against the defendant baseless? See id. at 1311–13. If the answer to that question is no, then "the prosecution is objectively reasonable," and the Hyde Amendment inquiry comes to an abrupt halt. Id. at 1317.

Applying this test, the opinion concludes that solely because probable cause supported the charges in the Superseding Indictment, the prosecution of Dr. Shaygan was "objectively reasonable" and therefore not in bad faith. See id. at 1313, 1315–16. This approach makes all of the prosecutorial misconduct found by Judge Gold irrelevant. And by this route, the opinion reaches the remarkable holding that the District Court had "no discretion to award Shaygan attorney's fees and costs." Id. at 1317 (emphasis added). Yet, this holding contradicts what Congress said when it passed the Hyde Amendment and renders the statute incapable of doing what Congress intended. As a result, and not surprisingly, it marks an unwarranted departure from the decisions of our sister Circuits and from Supreme Court precedent.

In passing the Hyde Amendment Congress sought to respond to a wide range of prosecutorial misconduct, including instances where prosecutors "keep information from [the defendant] that the law says they must disclose," "hide

15

information" and "suborn perjury." 143 Cong. Rec. H7786-04, at H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Hyde). Thus, it seems Congress clearly understood that the presence of probable cause does not, and should not, excuse prosecutorial misconduct at later stages of a case. Indeed, the legislative history expressly reflects that "a grand jury finding of probable cause to support an indictment does not preclude a judge from [awarding attorney's fees]." H.R. Rep. No. 105-405, at 194 (1997) (Conf. Rep.), reprinted in 1997 U.S.C.C.A.N. 2941, 3045 (emphasis added).

To capture the full range of prosecutorial misconduct, Congress adopted the term "the position of the United States" from the Equal Access to Justice Act (EAJA). See United States v. Gilbert, 198 F.3d 1293, 1300 (11th Cir. 1999) (noting that Congressman Hyde "patterned his amendment after" the EAJA). The EAJA provides for attorneys fees to litigants who prevail against the United States in civil cases where the government's position is not "substantially justified." See 28 U.S.C. § 2412(d)(1)(A). By the time Congress was considering Congressman Hyde's proposal, and in the context of awarding attorneys fees against the government, the term "the position of the United States" had acquired a specific meaning. In Commissioner, INS v. Jean, 496 U.S. 154, 110 S. Ct. 2316 (1990),

the Supreme Court held that the term requires a court to consider "a case as an inclusive whole." Id. at 161–62, 110 S. Ct. at 2320.

Based on this expansive interpretation of the term "position," the First Circuit has recognized that, under the Hyde Amendment, an award may properly be based on "an array of government conduct both before the indictment and during litigation." United States v. Knott, 256 F.3d 20, 31 (1st Cir. 2001). In the same way, the Sixth Circuit has observed that under the Hyde Amendment, "[w]hen assessing whether the position of the United States was vexatious, frivolous, or in bad faith, the district court should [evaluate] the case as an inclusive whole." United States v. Heavrin, 330 F.3d 723, 730 (6th Cir. 2003) (quotation marks omitted). Rejecting the idea that the Hyde Amendment contemplates "a precise litmus test," the Sixth Circuit cautioned that courts "must not fail to see the forest for the trees." Id.

Decisions from other Circuits also reflect that the term "position" requires a court to examine "a case as an inclusive whole," Jean, 496 U.S. at 161–62, 110 S. Ct. at 2320. See, e.g., United States v. Porchay, 533 F.3d 704, 707–08, 711 (8th Cir. 2008) (examining whether government conduct following the dismissal of the indictment was in bad faith); United States v. Manchester Farming P'ship, 315 F.3d 1176, 1185–86 & n.25 (9th Cir. 2003) (examining whether government

17

conduct both after the indictment was filed and during trial demonstrated bad faith).

This Circuit stands alone in its now established rule that in order to discern "the position of the United States," a court need only examine the basis for the charges. See Shaygan, 652 F.3d at 1312–16. I find great irony in that, under our rule, the type of misconduct Congressman Hyde specifically decried in urging his colleagues to adopt his amendment is now beyond the scope of the law. This new and myopic view of what constitutes "the position of the United States" under the Hyde Amendment leads to a particularly shocking result in this case. For me this is most plainly manifested in the Court's conclusion that these prosecutors' conduct—only some of which I have described here—was "objectively reasonable." Id. at 1317.

IV.

In closing, I must say that I realize there are few less popular classes of people for whom to advocate than those charged with federal crimes. One might say that a person, like Dr. Shaygan, who has been acquitted has nothing to complain about. But Congress thought differently. The rules that govern our criminal justice system have developed over the life of our country to allow those accused of crimes to know the evidence against them; to be advised of the

18

weaknesses in that evidence; and to be able to confront the witnesses against them with full knowledge of information which might color their testimony. Just like the rest of us, Dr. Shaygan was constitutionally entitled to all of this as he faced the serious charges leveled against him. The government violated Dr. Shaygan's rights, and now, contrary to what Congress has provided, he is left alone to pay the costs he suffered at the hands of these rule breakers.

It also strikes me as dangerous to render trial judges mere spectators of extreme government misconduct. By enacting the Hyde Amendment, Congress gave trial judges the responsibility to determine whether "the position of the United States was vexatious, frivolous, or in bad faith." I say Judge Gold performed that unpleasant duty admirably, and he had every reason in law to expect that his Order would be affirmed. Indeed, this Court has said "prosecutors must expect that this court will support district judges who take reasonable steps to correct prosecutorial conduct that is not right." United States v. Wilson, 149 F.3d 1298, 1304 (11th Cir. 1998). This Court's decision not to reconsider this case en banc forsakes that principle. I respectfully dissent.

19