**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David T. BRAUNSTEIN, Defendant–
Appellant.**

**No. 00–10505.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 12, 2001.

Filed Feb. 25, 2002.

Philip H. Stillman, Flynn, Sheridan, Tabb and Stillman, Del Mar, CA, for the defendant-appellant.

Karin Hoppmann and Nina Goodman, Department of Justice, Washington, DC, for the plaintiff-appellee.

David T. Braunstein and Geraldine Valdez, San Diego, CA, for trustee Gladstone.

Before: PREGERSON, RAWLINSON, Circuit Judges, and WEINER,[1] District Judge.

PREGERSON, Circuit Judge.

Appellant David T. Braunstein ("Braunstein") appeals the district court's order denying his motion for attorney's fees pursuant to the Hyde Amendment, 18 U.S.C. § 3006A. Braunstein asserts that he incurred approximately $200,000 in attorney's fees defending against sixteen federal criminal charges of wire fraud, interstate transportation of goods obtained by fraud, and money laundering. He claims that under the Hyde Amendment, the government is required to pay his attorney's fees because the prosecution was "vexatious, frivolous, or in bad faith." We have jurisdiction pursuant to 28 U.S.C. § 1291, and, as we find the prosecution was frivolous, we now reverse.

## I.

## FACTS and PROCEDURAL HISTORY

### A. Braunstein's Business Dealings With Apple Latin America

Braunstein is a businessman who bought and sold computers, often through two companies he owned, Pacific Rim Technologies Corporation and Almacen. Braunstein maintained a computer distribution company in California and a computer retail store and refurbishing plant in Tijuana, Mexico. From September 1993 through April 1996, Braunstein bought computers from the Apple Latin America Company ("ALAC"). ALAC is a subdivision of Apple Computer, Inc. ("Apple"), an international computer manufacturer and sales company headquartered in the United States. ALAC is responsible for the sale of Apple products to Mexico, Central America, South America, and the Caribbean.

Braunstein's business relationship with ALAC consisted primarily of buying excess or obsolete Apple computers at greatly reduced prices.[2] ALAC would ship the computers from Apple's warehouses in Chicago, California, and Canada to Braunstein's warehouse in San Diego. Although Braunstein was known as an ALAC distributor whose sales territory was Mexico, Braunstein sold most of his ALAC inventory within the United States, to an Arizona businessman named Alan Kaplan ("Kaplan").[3] Kaplan, in turn, sold the ALAC computers to other Apple resellers and wholesalers in the United States at prices substantially below Apple's listed wholesale price for such products. ALAC's former Sales Director referred to distributors like Braunstein and Kaplan as "the Mar-

---

1. The Honorable Charles R. Weiner, Senior District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

2. Testifying before the grand jury, Luis Rubio ("Rubio"), ALAC's former general manager, explained that "we were selling obsolete or semiobsolete product, end-of-production run, surplus inventory on a case-by-case basis to [Braunstein]."

3. As Alfredo Lopez ("Lopez"), ALAC's former Director of Sales, explained in his grand jury testimony:

The deal would be I need [to] sell—I have 1,000 machines of a certain type in my warehouse, and I would like to get rid of all those 1,000 machines tomorrow, and I need to offer somebody a special price to take all 1,000 machines by the following day. So [Braunstein] was interested in getting those types of products .... Also, products that are obsolete, or were about to be obsolete, would command a much lower price because the perceived value in the market was that they were going to drop in price very fast.

shalls or the T.J. Maxx of the computer industry."[4]

When purchasing Apple products, Braunstein dealt directly with Lopez and Carlos Valladeros ("Valladeros"), ALAC's regional sales representative for northern Latin America. In addition, Braunstein's business ventures with ALAC were overseen by Rubio.

Braunstein always paid ALAC up front, in cash. In exchange, he received an additional one percent discount. Lopez estimated that Braunstein's purchases brought ALAC "about a million dollars a month, which could be about five percent of the sales for Apple Latin America. It could have gone as high as 55 percent of the overall sales of Apple Latin America." Braunstein's dealings with ALAC were not, however, formalized by written contract; instead, the parties reached an oral understanding for each deal as to quantity and price.[5] Lopez testified that it was unusual to conduct business with a distributor without a contract, but that "[i]t was done sometimes."

According to internal and external reports, ALAC "was under pressure to generate high sales volume," and deals such as the one with Braunstein facilitated that goal. Some of this pressure appears to stem from the fact that ALAC employees worked on commission. According to the postal inspector's report, if ALAC employees "made their gross margin, unit mix, and revenue, a bonus would be given." Braunstein's business was particularly important because he could afford to buy large quantities of product from ALAC. [A]fter the currency devaluation, "most all of the distributors in Mexico were virtually bankrupt," so that "they really had no credit or cash to purchase any product."

## B. Gray Marketing at ALAC: The Kroll Report

ALAC's deals with Braunstein benefitted ALAC in the short term by increasing the sales volume of products for which there were few, if any, other buyers. But the deals hurt Apple in the long-term by undercutting its ability to generate profitable sales in the United States. ALAC's business dealings effectively put ALAC's own distributors (whose sales area was limited to Latin America and the Carribean) into direct competition with Apple's United States distributors. Moreover, Braunstein and Kaplan were selling their Apple inventory within the United States at a much cheaper price than the other United States distributors were offering, which hurt the sales of those distributors and caused confusion and resentment in the market.

In August 1996, Apple's management became concerned about the systemic underselling of Apple's United States distributors by ALAC distributors. Specifically, Apple was concerned that ALAC distributors were engaging in "gray marketing," which involves the sale of Apple products outside the territory for which they are intended, and at a lower price than Apple would have authorized. Apple hired Kroll Associates ("Kroll"), an international private investigation firm, to look into ALAC's business practices.

Kroll issued its findings in a fifteen-page written report, on January 7, 1997. The report concluded that, "a potentially signif-

---

4.  The type of sales transacted between ALAC and Braunstein were alternately described as ALAC's method of "flushing" and "dumping" unwanted excess product.

5.  The parties signed a contract on December 5, 1995, three months before Braunstein's final purchase from ALAC. However, Braunstein did not receive the executed contract until three months after his final purchase.

icant gray market problem existed" at ALAC and that "[t]here also appear to be a number of issues internal to ALAC which were contributing to the gray market problem." Kroll based this conclusion on its "preliminary findings, [which] consisted of specialized audits, interviewing selected persons, and reviewing pertinent documentation."

The following excerpts from the Kroll report summarize its findings and conclusions:

> .... ALAC employees were under tremendous pressure to sell large numbers of product, termed "flushing." Although not specifically stated, the emphasis appear[s] to be on achieving sales volume rather than profit margins.
>
> During the last year or so, ALAC has aggressively sought out new clients.... Changes in ALAC's policies have now put ALAC in direct competition with U[nited] S[tates] E[xporters], as both now sell to I[n] C[ountry] D[istributors].
>
> There was no accountability or penalties related to the [gray] market. ALAC was under pressure to generate high sales volume, and delivered most of its product F[ree] O[n] B[oard] Miami. Once the product left [the] ALAC warehouse there was little if any effort to ensure it was exported as claimed by the customer.
>
> ALAC does not obtain any of the reporting required under the terms of the signed agreements (which are currently expired) with its customers.
>
> There may also be Apple employees involved in gray marketing activities.

**6.** The most plausible reason for the investigation is that Apple alerted the United States Attorney's Office to the problem. The United States Attorney's Office in Arizona may have gotten involved because it was already investigating criminal fraud allegations against Kaplan. The Arizona United States Attorney's

## C. The United States Attorney's Office in Arizona

For reasons that are somewhat unclear from the record, the United States Attorney's Office in Arizona began investigating ALAC's business deals with Braunstein in the fall of 1997.[6] In August 1997, the Assistant United States Attorney ("AUSA") assigned to the ALAC case alerted Braunstein that he had become a target of a federal criminal investigation, and Braunstein retained Michael L. Lipman ("Lipman") as counsel.

## D. The AUSA's Investigation

In August, September, and October 1997, the AUSA conducted telephone interviews of several ALAC employees who had dealt directly with Braunstein, including Valladeros. The AUSA also interviewed Lopez.

### 1. The Valladeros Interview

The AUSA interviewed Valladeros on August 21, 1997, and summarized the contents of the interview in a memorandum. According to the memorandum, Valladeros stated that ALAC's business dealings with Braunstein began in 1993, when ALAC had "some product on hand which they wanted to get rid of ... [and] Braunstein agreed to take the product." The AUSA's memorandum continues:

> It was [Valladeros's] understanding that Braunstein could sell in his area of San Diego and sell to other U.S. companies who had dealings with Apple and exported products. [Valladeros] spoke exten-

Office obtained an indictment against Kaplan in the fall of 1997 for conducting "a fraudulent rebate scheme involving Apple Powerbook 5300's." The government has never accused Braunstein of any involvement in that rebate scheme.

sively with Braunstein regarding the concept and he also gave his report to Apple.

## 2. Lipman's Letter to the AUSA

On September 23, 1997, Lipman wrote the AUSA a twenty-two page letter, in which he set forth in detail the legal and factual bases for his belief that Braunstein had done nothing illegal. Lipman wrote:

> We believe that our client did not have a valid contract with Apple Latin America at any time during these transaction[s]; that Apple Latin America was aware that there were no legal restrictions on my client's resale of product; and that Apple Latin America knew, or should have known, that my client was selling the bulk of the product to a reseller in the U.S. Furthermore, Apple Latin America was more than happy to have these transactions occur because they created a material increase in their revenues.

Lipman continued, "[t]o the degree that particular employees or former employees of Apple Latin America contend that they thought Mr. Braunstein was selling his product in Mexico, we submit that Apple's own financial documents will disprove these contentions." Lipman then detailed ALAC's financial woes and its efforts to "rebuild its distribution network," including its development of the "Alternate Channel Concept." He explained:

> [T]he "alternate channel" concept called for Apple Latin America to recruit United States distributors in the "border states" (primarily California, Texas and Florida). These distributors would be offered lower prices than U.S. distributors with the expectation that they could "recapture" the Latin American reseller market for ALAC.... This program was established so the U.S. distributors could not undercut the Lat-

in American in-country distributors (and take away sales from the Apple Latin America division) and effectively "gray market" product into Latin America. Under the "alternate channel" concept, these distributors could sell to, among others, United States businesses with operations in Latin America. Thus, the program itself provided for sales of computers inside the United States. Additionally, it was anticipated by ALAC, and ALAC was willing to accept, that some "gray marketing" would occur into United States markets.

Lipman informed the AUSA that she could find confirmation of the alternative channel concept in "pricing studies performed by Apple Latin America," memos between ALAC and other Apple divisions, and internal documentation and memoranda within ALAC. Lipman also explained in detail Braunstein's relationship with ALAC and told the AUSA that internal ALAC documents would confirm that Braunstein was an alternate channel distributor who generated over $25 million in revenue for ALAC and that "ALAC had Braunstein existing entirely outside its normal distribution network for two years."

In a separate section of the letter, entitled "Apple's Knowledge Regarding Braunstein's Sales," Lipman listed "numerous sources of information and documentation" in Apple's possession that he believed would demonstrate that ALAC knew that Braunstein was selling its product in the United States. The list included: (1) registration and warranty cards for the computers sold by Braunstein to United States distributors that were returned to Apple; (2) tracking records documenting the return of those registration and warranty cards; (3) serial number lists for all computer sales to Braunstein; (4) damage claims submitted by United States

dealers who bought from Braunstein; and (5) warranty claims and requests for technical services from Braunstein's United States buyers.

Lipman also described in detail one particular deal in which Braunstein purchased 5,500 Powerbook 5300's from ALAC in the winter of 1996 at $650 and $700 per unit, which was "significantly lower than the standard price for the Powerbooks." Lipman stated that the low price at which Braunstein obtained the Powerbook sales caused the United States Attorney's Office to believe that Braunstein had promised ALAC to sell them only in Mexico. Lipman then explained why this conclusion was incorrect. Lipman advised the AUSA that she could find marketing reports and technical analyses at Apple revealing that the Powerbooks had sold poorly and that ALAC was interested in "dumping" the Powerbooks wherever it could. Lipman continued:

> The leaders of Apple Latin America at the time (namely Luis Rubio, Neil Montilla, and Al Lopez) knew they could "quietly" dump the Powerbooks (which were already excess inventory for Apple USA) with Braunstein, and be heroes. Accordingly, Apple Latin America did not care where Braunstein sold the computers, or even if he sold them.

Lipman stated in his letter that "[t]he issue of gray marketing was so prevalent at Apple, in fact, that the company engaged both its internal security and an outside firm to investigate the problem." Lipman stated that an investigation of Apple's files would reveal reports from Apple's director of security "documenting the gray market problem" and "similar documentation from the Miami branch of the Kroll group, which was retained by Apple to investigate how the gray marketing of

Apple products was able to persist on such a widespread basis."

Lipman concluded his letter by telling the AUSA: "You invited us to provide you evidence to support our theories; unfortunately, this documentation is at Apple, and *only you can gain access to it.*" (Emphasis added).[7]

### 3. Montilla and Lopez Interviews

On September 8, 1997, three months before Braunstein was indicted, the AUSA spoke with Montilla. According to the AUSA's memorandum of the interview, Montilla stated that "[i]t was anticipated that Braunstein's companies would take [ALAC] product and sell to resellers in Mexico." Montilla also stated, however, that "[h]e never dealt with Braunstein. Dealings would have always been between Carlos [Valladeros], Al [Lopez] . . . and Braunstein."

The AUSA interviewed Lopez on October 15, 1997. According to the AUSA's memorandum of the interview, Lopez stated that "[h]e is not familiar with 'the term alternate channel concept.'" Lopez also stated that Braunstein's "territory was Mexico" and that Braunstein was not supposed to sell Apple products in the United States. According to the AUSA's memorandum of the interview:

> *[Lopez] wrote a series of memos regarding what he anticipated as a problem for Apple. This related to the gr[a]y marketing. He reported this problem in approximately April 1996. . . . There were pages and pages of hard copy documents sent between himself and Luis Rubio regarding this problem.* As a result of this conflict, he was placed on a "do better" plan. During late August, 1996, [there was] a management meeting. [Management] informed [Lopez]

---

7. At this point, Braunstein had not been for- mally charged or indicted.

that [it] was hiring an outside firm to look at the grey marketing problem. [It] also told him to report any of his suspicions to this third party. In January, 1997, he was taken off the "do better" plan.

(Emphasis added).

## E. The Grand Jury

The AUSA convened a grand jury in the District of Arizona to present her case against Braunstein. On August 21, 1997, the same day that the AUSA interviewed Valladeros by telephone, Valladeros appeared as a witness before the grand jury and testified about his business dealings with Braunstein. Valladeros testified that, as an ALAC sales representative, he sold computers to Braunstein from 1993 until Valladeros left the company in 1995. Responding to repeated questions from the AUSA as to whether Braunstein was told that he could only sell Apple products in Mexico, Valladeros stated that he did not recall. The AUSA then asked: "If [Braunstein] told you that the [Apple] product was going to stay in the United States and be shipped to Nebraska, for example, would you have sold him the product?" Valladeros replied: "No." Several transcript pages later, the following exchange occurred:

> AUSA: And did you explain to [Braunstein] he could not sell [Apple products] inside the United States?
>
> VALLADEROS: Again, when I explained to him the concept, I do not recall if I was explicit to him telling him that he could not sell in the United States.... And to be honest with you, having dealt in Latin America for eight, nine years, it never crossed my mind the fact that, you know, illegally selling product into the U.S., because it didn't make sense.

> AUSA: So you assumed when you were negotiating with [Braunstein] that because you're Apple Latin America, this is all going to be exported to Latin America?
>
> VALLADEROS: Correct.

The AUSA later asked Valladeros, "do you know of anyone at Apple, either Apple Latin America or Apple America, who told Mr. Braunstein he could sell the product within the U.S. and not export it?" Valladeros replied, "Not to my knowledge."

This grand jury testimony by Valladeros flatly contradicted his answers to the AUSA's questions during the telephone conversation they had earlier *that same day*. In the telephone interview, Valladeros told the AUSA that "Braunstein could sell in his area of San Diego and sell to other U.S. companies who had dealings with Apple and exported products. "Valladeros also told the AUSA that he and Braunstein" spoke extensively" about Braunstein's United States sales and that Valladeros "gave [a] report to Apple" about these conversations.

The AUSA also called Rubio and Lopez as grand jury witnesses. Both Lopez and Rubio testified that they were laid off by Apple in 1997 and that Braunstein was only authorized to sell Apple products within Latin America. On December 11, 1997, the grand jury returned an indictment charging Braunstein with multiple counts of wire fraud, in violation of 18 U.S.C. § 1343; interstate transportation of goods obtained by fraud, in violation of 18 U.S.C. § 2314; and money laundering, in violation of 18 U.S.C. § 1956. The district court summarized the indictment as follows:

> The Government alleges that Defendant entered into a conspiracy with co-defendant Alan Kaplan to defraud Apple Computer by inducing Apple to sell them Apple products at prices substan-

tially below what they could be purchased [for] in the United States. Defendant would purchase computers through his Mexican business entities ostensibly for sale in Mexico. However, instead of distributing and selling the products in Mexico, Defendant would instead sell the products in the United States through co-defendant Kaplan. Co-defendant Kaplan would then resell the Apple products to other Apple reseller[s] and wholesalers in the United States at prices substantially below Apple's listed wholesale price for such items.

Braunstein moved to dismiss the indictment on the ground that it did not allege a crime. The court denied the motion.

### F. Discovery

On February 12, 1999, Philip H. Stillman, ("Stillman") who had replaced Lipman as Braunstein's counsel, subpoenaed various documents and records from Apple. Apple, represented by John J. Steele, ("Steele") moved to quash the subpoena as overly broad, and the government joined in the motion. On February 23, 1999, the district court granted the motion to quash and ordered Stillman to meet with Steele to "narrow down the number of areas of documents that you seek." The court also ordered Steele to "turn over the Kroll Report unredacted." The court continued:

> The following things are clear: Apple is a complaining witness. Apple is—or complaining party, I should say. And the defendant is entitled to discovery on items relevant to the charges in the Indictment. And lest it come as a surprise to anyone, the area of concern and dispute is that the defendant contends that Apple was both knowledgeable about and content with and indeed supportive of the notion that product directed to Apple Latin America was going to be sold at wholesale and/or retail in the United States. *It is the defendant's contention that he was aware of that and participated in that what has been called from time to time, an alternative channel of distribution, unquote with the knowledge of Apple, with the knowledge of Apple Latin America, and that accordingly, his conduct could not be unlawful since it would negate intent and indeed if it was consistent with Apple's distribution practice, it would be simply a commercial interaction between the defendant's company and Apple. Now, you people can argue all day long about that. And that's what the jury will decide. If they believe Mr. Braunstein's defense, he will be acquitted.*

(Emphasis added).

On March 8, 1999, the parties were back in court arguing over the subpoenas, and the district court was getting impatient with Apple:

> STEELE: As I understand the question is why has the Kroll report not been turned over to Mr. Stillman.
>
> COURT: That's exactly right.
>
> STEELE: Okay. As I explained to Mr. Stillman—
>
> COURT: I mean just why. Just why has it not been? Do you have it or not have it?
>
> STEELE: I myself do not have it.
>
> COURT: Well, I mean you say "I myself." I myself don't have it either. But, by golly, I myself can get it in a hurry if I need it. Now, do you have it or control over it and can you get it to Mr. Stillman by five o'clock today along with all of the exhibits[?]
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> COURT: All right. Now what I want, Mr. Steele, within the hour, is to have someone order Mr. Kroll, if there is one,

to send to Mr. Stillman a copy of that report with a copy of every exhibit so that he—that is no later than five o'clock today or there will be enormous economic sanctions imposed against Apple Computer Corporation. Is that clear?

On March 12, 1999, Apple still had not turned over the Kroll report or any of the other subpoenaed documents. On March 22, Stillman moved for a continuance of the trial. On March 29, the court granted the motion and reset the trial date for May 11. On the same day, the court told Apple to turn over the subpoenaed documents "to the chambers of this court" no later than April 1. Apple did not comply with the order.

After joining in the first motion filed by Apple to quash the subpoena, the United States Attorney's Office was not involved in the discovery battle. Instead, as the AUSA later told the district court, "[w]e remained silent."

On April 14, 1999, less than a month before the trial date, Apple turned over the subpoenaed documents to Braunstein. Among the documents that Apple turned over were memos written by Lopez and Rubio in which they openly acknowledged the existence of gray market practices among ALAC's distributors. Specifically, in a January 20, 1994 memo, Rubio stated that "[o]ur concept of capturing the gray market is not a new idea," and "[t]he gray market is a fact of life." In a memo to Rubio dated August 15, 1996, Lopez stated:

> We have met [on] several occasions to discuss the issue of gray market [practices]. *In most, if not all, of these occasions you personally have acknowledged the fact that a significant number of our distributor's sales are channeled to others and to 3rd party sources that feed the gray market in the U.S.* This is why I advocated so strongly to change our

pricing structure, to reduce the gap and advantages that some of our customers have, that enable them to sell large volumes in the gray market. You have specifically mentioned to me in several conversations that we must move away cautiously from it, but we cannot eliminate this practice overnight because "our business will be affected severely." (Emphasis added).

On April 21, 1999, the AUSA moved for a continuance of the trial date. The court denied the motion. On May 3, 1999, the AUSA moved to dismiss the indictment without prejudice. The court granted the motion.

## G. Hyde Amendment Motion and Hearing

On July 2, 1999, Braunstein filed a motion for attorney's fees pursuant to the Hyde Amendment. The government filed an opposition, and a hearing was held on April 5, 2000. At the hearing, Stillman argued that the AUSA knew about the Lopez–Rubio memos detailing ALAC's knowledge of the gray market practices of its distributors. Specifically, Stillman pointed out that: (1) Lipman, told the AUSA about the Lopez–Rubio memos in his September 23, 1997 letter; (2) Lopez told the AUSA about the memos during their telephone interview on October 15, 1997; and (3) the Kroll report referred to the memos. Stillman stated:

> This was not a needle in a haystack. These documents came from Mr. Lopez's and Mr. Rubio's personnel files. There was a personnel file. It would have taken one phone call from [the AUSA]. [The AUSA] got stacks and stacks of documents, all sales invoices and so forth.... She could have made one phone call to Apple, who was cooperating with [the AUSA] for three years, providing logistic support, document

support, and factual support, could have called them on the telephone and said, I want to see Lopez's personnel file.

The AUSA responded by stating that "the Government never alleged this as a gray market case. This is a fraud case ...." She continued:

> Now [the documents] may help the defendant put on his theory of the case which is that gray marketing was a problem at Apple. But they certainly do not constitute Brady material under the Government's theory of the case which is represented in the Indictment, and that is that the defendant engaged in fraudulent activity. He made misrepresentations to Apple repeatedly about where this product was going, and therein lie[s] the fraud.

The AUSA then stated that she received the documents that Stillman subpoenaed from Apple on April 14, 1999, the same day that Stillman did. She continued, "Did we know about a gray marketing issue? Well, obviously, we did, because we had the Kroll Report. But since gray marketing has nothing to do with wire fraud, mail fraud, interstate transportation of goods taken by fraud and money laundering, it's not exculpatory."

Stillman responded: "[T]he concept that gray marketing was not an issue in this case is simply gas. I mean it's—it's the core of the case. If Apple's condoning sales outside the territory, that's it. It's [the] end of [the] story."

On October 3, 2000, the district court entered its five-page order denying Braunstein's motion for attorney's fees. The court concluded that the government's case was not "contrary to established law on fraud ... [and] based on the facts as they evolved, was not frivolous." This appeal followed.

## II.

### STANDARD OF REVIEW

■ The district court's ruling on a Hyde Amendment motion is reviewed for abuse of discretion. *United States v. Lindberg*, 220 F.3d 1120, 1121 (9th Cir. 2000). "Under that standard, this court cannot reverse unless it has a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Tucor Int'l, Inc.*, 238 F.3d 1171, 1175 (9th Cir.2001).

## III.

### DISCUSSION

*A. Braunstein's Notice Of Appeal Was Timely Filed*

■ As an initial matter, the government contends that the panel lacks jurisdiction over Braunstein's appeal because it is untimely. The issue concerning which statute of limitations applies to Hyde Amendment appeals is one of first impression in the Ninth Circuit. Among the circuits that have addressed this issue, there is a split of authority. The Fourth, Fifth, and D.C. Circuits have held that Hyde Amendment appeals are *civil matters* governed by Federal Rule of Appellate Procedure 4(a). *In re 1997 Grand Jury*, 215 F.3d 430, 435–36 (4th Cir.2000); *United States v. Truesdale*, 211 F.3d 898, 904 (5th Cir.2000); *United States v. Wade*, 255 F.3d 833, 839 (D.C.Cir.2001). Pursuant to Rule 4(a), a notice of appeal must be filed "within 30 days after the judgment or order appealed from is entered." Fed. R.App. P. 4(a)(1)(A). If the United States is a party, the time is extended to 60 days. Fed. R.App. P. 4(a)(1)(B).

The Tenth Circuit has held that Hyde Amendment appeals are *criminal matters* governed by Federal Rule of Appellate Procedure 4(b). *United States v. Robbins*,

179 F.3d 1268, 1270 (10th Cir.1999). Rule 4(b)(1)(A)(i) provides that, "[i]n a criminal case, a defendant's notice of appeal must be filed in the district court within 10 days after ... the entry of either the judgment or the order being appealed." Fed. R.App. P. 4(b)(1)(A).

In *Truesdale*, 211 F.3d at 902–03, the Fifth Circuit rejected the argument that Hyde Amendment appeals are criminal matters for three reasons. First, the court explained, the statute of limitations to file an appeal in a criminal case is short because of the significant liberty interest at stake, and "[a] motion under the Hyde Amendment ... does not implicate the movant's liberty interest." *Truesdale*, 211 F.3d at 903; *see also In re 1997 Grand Jury*, 215 F.3d at 435 (in Hyde Amendment motions "the criminal action itself is complete and all that remains is to determine whether[the prevailing party] can recover fees and expenses").

Second, the Fifth Circuit noted that the Hyde Amendment adopted substantially all of "the procedures and limitations" of the Equal Access to Justice Act ("EAJA"), which provides for the recovery of attorney's fees in unjustified civil actions brought by the federal government. See 28 U.S.C. § 2412. The statute of limitations for the filing of a notice of appeal of an EAJA claim is governed by Rule 4(a). *Truesdale*, 211 F.3d at 903. The court explained:

> Here, a motion under the Hyde Amendment is equivalent to a motion under the EAJA. In each case, the movant is seeking an award of attorney's fees based upon a litigating strategy employed by the government that, the movant claims, conflicts with statutorily defined notions of fair play. It makes little sense that the time period during which the movant may file an N[otice] O[f] A[ppeal] from the denial of such a motion should differ

depending upon whether the government's potentially offensive litigation strategy was employed in a civil case or a criminal case.

*Id.* at 904.

Finally, the court in *Truesdale* noted that a practical problem might arise from characterizing a Hyde Amendment appeal as a criminal matter; namely that, generally, "the government cannot, without statutory authority, appeal from a decision in a criminal case." *Id.* at 904. Thus, if Hyde Amendment motions were declared criminal matters, the movant would be entitled to appeal from an adverse ruling by the district court, but the government would not. *Id.* The court concluded "[w]e cannot imagine that the Congress intended such a result and are unwilling, absent clearer statutory direction, to establish precedent in this circuit lending support to such an outcome." *Id.*

The Tenth Circuit's explanation in *Robbins* for characterizing a Hyde Amendment motion as a criminal matter is less convincing. *See* 179 F.3d at 1269–70. The court simply states that "[b]ecause an appeal under the 'Hyde Amendment' arises out of a criminal case, Fed. R.App. P. 4(b) applies and litigants must file a notice of appeal within the 10 days after the order appealed from is entered." *Id.* As the Fourth Circuit stated in rejecting this reasoning, *Robbins* "relies upon [a] conclusory rationale." *In re Grand Jury*, 215 F.3d at 435.

Because we are persuaded by the reasoning of the Fifth Circuit in *Truesdale*, we join the Fourth and D.C. Circuits in holding that Hyde Amendment appeals are governed by Federal Rule of Appellate Procedure 4(a). Braunstein's appeal is therefore timely because he filed his notice of appeal on October 16, 2000, thirteen days after entry of the order denying his Hyde Amendment motion.

*B. The District Court Abused Its Discretion In Denying Braunstein's Motion For Attorney's Fees Under The Hyde Amendment Because The Government's Prosecution Was "Frivolous"*

### 1. The Hyde Amendment: Provisions, Legislative History, and Subsequent Interpretation by the Courts

■ The Hyde Amendment was enacted by Congress as part of a 1998 appropriations bill and is located in a statutory note to 18 U.S.C. § 3006A. *United States v. Gilbert,* 198 F.3d 1293, 1298 (11th Cir. 1999). It provides, in relevant part, that courts may award attorney's fees and other litigation expenses to prevailing criminal defendants "where the court finds that *the position of the United States was vexatious, frivolous, or in bad faith,* unless the court finds that special circumstances make the award unjust." Pub.L. No. 105–119,111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) (emphasis added).[8] The defendant bears the burden of proof, "as well as establishing that he is otherwise qualified for the award under the law." *United States v. Adkinson,* 247 F.3d 1289, 1291 (11th Cir.2001) (citation omitted).[9]

In *Tucor,* we held that "[t]he plain meaning of the [Hyde Amendment] text indicates that the test is disjunctive—*satisfaction of any one of the three criteria (vexatiousness, frivolousness, or bad faith) should suffice by itself to justify an award."* 238 F.3d at 1178 (emphasis added). The key terms of the Hyde Amendment, "vexatious, frivolous, or in bad faith," are not defined in the statute.

Because the district court based its ruling on a finding that the prosecution was not frivolous in instituting the criminal proceeding against Braunstein, our analysis will focus on that prong of the Hyde Amendment. *United States v. Sherburne,* 249 F.3d 1121 (9th Cir.2001) stated in a footnote that "frivolous" has only an objective component. *Id.* at 1126 n. 4. No further guidance was given. Therefore, the Hyde Amendment's legislative history and out-of-circuit authority will be considered to provide helpful guidance in deciphering the meaning of "frivolous." United States Representative Henry Hyde, who wrote

---

8. The full text of the Hyde Amendment provides:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than the case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may

> receive evidence ex parte and in camera ... and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.
>
> 18 U.S.C. § 3006A.

9. Specifically, as a threshold matter, the defendant must show that: (1) the case against him was pending on or after the enactment of the Hyde Amendment; (2) his net worth is less than $2 million; (3) he was the prevailing party in a criminal prosecution; (4) he was not represented by assigned counsel paid for by the public; (5) his attorney's fees were reasonable; and (6) no special circumstances exist to make the award unjust. *United States v. Adkinson,* 247 F.3d 1289, 1291 n. 2 (11th Cir.2001).

the original version of the Amendment, explained that successful claimants under the Hyde Amendment must show that the prosecutors "are not just wrong, they are willfully wrong, they are frivolously wrong. They keep information from you that the law says they must disclose. They hide information. They do not disclose exculpatory information to which you are entitled." 143 Cong. Rec. H7786–04, HH7791 (Sept. 24, 1997) (statement of Rep. Hyde).[10] Thus, it is clear that, "[e]ven in its earliest form, the Hyde Amendment was targeted at prosecutorial misconduct, not prosecutorial mistake." *Gilbert,* 198 F.3d at 1304.

■ In *Gilbert,* the Eleventh Circuit interpreted "frivolous" using the "ordinary meaning" of the word as provided in Black's Law Dictionary. *Id.* at 1298–99 (citing *Chapman v. United States,* 500 U.S. 453, 462, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)). The court determined that "frivolous" means "groundless ... with little prospect of success; often brought to embarrass or annoy the defendant." *Id.* at 1299 (citing Black's Law Dictionary 668 (6th ed.1990)).

The Fourth Circuit has adopted the Eleventh Circuit's approach to defining "frivolous." *In re 1997 Grand Jury,* 215 F.3d at 436 (citing *Gilbert's* interpretation with approval). In addition, in *Lindberg,* this court stated that the Gilbert court's approach to defining these terms was "sensible enough," but found it unnecessary to reach the issue. *Lindberg,* 220 F.3d at 1125. Because the Eleventh's Circuit's approach to defining "frivolous" and "bad

faith" is clear and well-reasoned, we join the Fourth Circuit in adopting it.

### 2. Application of the Frivolous Standard to the Facts of This Case

■ To show that the criminal prosecution was "frivolous," Braunstein must demonstrate that the government's position was "foreclosed by binding precedent or so obviously wrong as to be frivolous." *Gilbert,* 198 F.3d at 1304.

The AUSA obtained an indictment against Braunstein for the federal crimes of wire fraud, interstate transportation of goods obtained by fraud, and money laundering. 18 U.S.C. §§ 1343, 2314, and 1956.

A defendant is guilty of wire fraud when he: (1) engages in a scheme to defraud; (2) uses the wires to further that scheme; and (3) has a specific intent to deceive or defraud. *See United States v. Garlick,* 240 F.3d 789, 792 (9th Cir.2001) (interpreting 18 U.S.C. § 1343). According to the indictment, Braunstein was guilty of wire fraud because he had "use[d] interstate wire communications to wire money to Apple Computer, Inc. to pay for select Apple products purchased from Apple Latin America" and he had made those purchases by falsely representing to Apple Latin America that he would sell those products only in Mexico.

A defendant is guilty of interstate transportation of goods obtained by fraud when the defendant: (1) obtains money or property by "false or fraudulent pretenses, representations or promises"; and (2) ships

---

**10.** The legislation was motivated by Representative Hyde and his colleagues' outrage over the prosecution of former Labor Secretary Ray Donovan and former Congressman Joseph McDade. Both Donovan and McDade were subjected to lengthy federal criminal prosecutions and ultimately were acquitted. *Gilbert,* 198 F.3d at 1299–1300. The intent of

the legislation was to ensure that innocent people would not bankrupt themselves defending against frivolous and bad faith prosecutions. *Id.* at 1300 (quoting Rep. Hyde as stating, "at least, if the Government tries to bankrupt someone because of attorney's fees, they ought to pay that").

that money or property in interstate commerce. *See* 18 U.S.C. § 2314. According to the indictment, Braunstein was guilty of this crime because he had shipped in interstate commerce ALAC computers, which he had obtained by fraud.

A defendant is guilty of money laundering when: (1) the defendant conducts a financial transaction knowing that the property involved in the transaction derives from an unlawful activity; and (2) the defendant acts with the intention of promoting the carrying on of an unlawful activity. *See* 18 U.S.C. § 1956(a)(1)(A)(ii). According to the indictment, Braunstein was guilty of money laundering because he used the proceeds of the computers taken by fraud from ALAC to perpetuate that fraud in future transactions.

To succeed in prosecuting Braunstein under any of the statutes outlined above, the government had to prove that Braunstein engaged in fraud; namely, that he obtained the computers from ALAC through false promises or representations. As the AUSA informed the district court during the argument on the Hyde Amendment motions, "this is a fraud case." Thus, the government's prosecution of Braunstein depended entirely on whether it could prove that he defrauded Apple. *See United States v. Oren*, 893 F.2d 1057, 1062 (9th Cir.1990) (stating that "one defrauds another when he causes him to be deprive[d] ... of property by means of false ... representations") (quoting *Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)).

The evidence in the record supports the conclusion that the government's position was so obviously wrong as to be frivolous. First, there was never an enforceable contract between Braunstein and ALAC. Thus, the AUSA's allegations of fraud were dependent on oral misrepresentations by Braunstein. Significantly, none of the grand jury witnesses testified that Braunstein made any such misrepresentations. More importantly, however, the AUSA had reason to believe, based on information from four independent sources, that employees at ALAC knowingly sold computer products to distributors who resold the same products on the "gray market"; i.e., outside of Latin America, the intended territory.

First, there is the AUSA's interview with Valladeros. According to the AUSA's notes, Valladeros told her that "it was his understanding that Braunstein could sell in his area of San Diego and sell to other U.S. companies who had dealings with Apple." Valladeros made this statement to the AUSA on August 21, 1997, *over three months before the AUSA obtained the indictment against Braunstein.* Second, the AUSA was aware that ALAC employees knew that their customers were selling Apple products in the United States through her interview with Lopez, Valladeros's supervisor. According to the AUSA's notes "there were pages and pages of hard copy documents sent between [Lopez] and Luis Rubio regarding this problem."

Third, the AUSA had in her possession the letter from Braunstein's attorney which detailed the defense to the fraud charges and directed her to sources within Apple and ALAC. Specifically, the letter stated that Apple had records of receiving registration records, warranty forms, and damage claims for the computers sold by Braunstein to United States distributors that were returned to Apple. The letter also described records of memoranda among its employees corroborating ALAC's participation in and dependence upon gray marketing. Fourth, the AUSA had the Kroll report, which supported the allegations that ALAC employees participated in gray market deals to boost their

sales volume at the expense of long-term profits for Apple.

All of this information was in the AUSA's possession prior to her decision to seek a grand jury indictment against Braunstein. To the extent there was any confusion regarding the extent of gray market awareness on the part of ALAC employees, the AUSA could have clarified the matter by examining documents within the possession and control of Apple, described by the district court as a "complaining party."

ALAC's well-documented participation in gray marketing negated any well-founded prosecution based on fraud because ALAC could not be deceived about practices it actively endorsed. Accordingly, the government's case against Braunstein was frivolous. Braunstein is entitled to attorney's fees under the Hyde Amendment.

### IV.

### CONCLUSION

We hold that Braunstein's Hyde Amendment appeal was timely filed pursuant to Federal Rule of Appellate Procedure 4(a). We reverse the district court's denial of attorney's fees pursuant to the Hyde Amendment, finding that the court abused its discretion in denying Braunstein's motion. We hold that Braunstein, as the prevailing party in a criminal prosecution that was "frivolous" is entitled to an award of his attorney's fees. Accordingly, we REVERSE in part and REMAND to the district court with instructions to grant Braunstein's motion for attorney's fees, and to determine the amount to be awarded pursuant to the Hyde Amendment.