**UNITED STATES of America**

v.

**Robert Clinton MORRIS,[1] Defendant**

**No. 4:02–CR–2–001–2CDL.**

United States District Court, M.D. Georgia, Columbus Division.

March 6, 2003.

---

1. Although the Government's indictment names "Robert Clinton Morris" as the Defendant, it is undisputed that the Defendant's correct name is "Robert Clinton Morris, Jr."

Candida S. Heath, Asst. U.S. Atty., Dayle Elieson, Susan Cowger, U.S. Attorney's Office, Dallas, TX, Dean Soble Daskal, Columbus, GA, for U.S.

## ORDER

LAND, District Judge.

The Court has pending before it an Application for Attorneys' Fees and Litigation Expenses of Defendant Robert Clinton Morris, Jr., submitted pursuant to the Hyde Amendment. Pub.L. No. 105–119, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory

notes). The Government prosecuted Morris on a single count of conspiracy to steal government property.[2] In an embarrassingly disorganized and feeble performance, the Government expended approximately two weeks to present its case, calling thirty-eight witnesses and tendering 240 exhibits.[3] In less than forty-five minutes of deliberations, the jury returned a verdict acquitting Morris.[4] Although the Court found the Government's prosecution disappointingly weak, the Court does not find that it was vexatious, frivolous, or in bad faith.[5] Therefore, Morris' application must be denied.

## FACTUAL BACKGROUND

Lieutenant Colonel Robert C. Morris, Jr. is a highly decorated officer in the United States Army. At the time of the events giving rise to his prosecution, he was the commander of the 1st Battalion of the 11th Infantry Regiment stationed at Fort Benning, Georgia. The evidence presented at trial made it clear that Morris enjoys a good reputation in the military and civilian community for his truthfulness and good character. On cross examination, several of the Government's witnesses, including general officers in the Army, provided compelling testimony bolstering Morris' personal credibility and professional competence.[6] Moreover, the Government was forced to concede that it had no evidence to suggest that Morris intended to profit personally from his alleged criminal conduct.

Morris' legal troubles began when he attempted to obtain surplus government medical supplies for the people of Rwanda. During his military career, Morris had developed an expertise in locating surplus government property that he could secure for the benefit of troops under his command. Morris also had a history of voluntary involvement in humanitarian programs and, in January of 1997, had even jointly established a non-profit charitable foundation, Partners International Foundation ("PIF"), to facilitate his humanitarian endeavors.

PIF's objectives were to provide charitable and humanitarian services throughout

2. The case proceeded to trial against Morris and co-defendant Gabe Trujillo, who was an alleged co-conspirator of Morris.

3. Had the Court not excluded irrelevant and duplicative evidence, the trial likely would have lasted an additional three weeks. Prior to trial, the Government had requested the issuance of 200 witness subpoenas and identified over 1800 exhibits.

4. The jury also acquitted co-defendant Trujillo.

5. The Court notes that this case was tried by the United States Attorney's Office for the Northern District of Texas and that the United States Attorney's Office for the Middle District of Georgia did not participate in the trial or the decision to prosecute. In fact, the case had initially been refused for prosecution by the Assistant U.S. Attorney for the Middle District of Georgia and found its way back to this district only after the U.S. District Judge for the Northern District of Texas transferred the case here, prophetically commenting: "I am not prejudging [Morris' guilt or innocence, but] I am just saying that for this kind of thing, to take the guy's life savings away from him when the prosecution could be ill-advised, perhaps, at the end of the day—that is the way it might turn out—I think is ... not something I want to do." (Mot. to Sever and Transfer Hr'g Tr. at 65–66).

6. The Army after completing its investigation of the events giving rise to Morris' indictment found no prosecutable wrongdoing and declined to pursue court martial proceedings against him. In fact, Morris' commanding officer, Major General John LeMoyne, continued to support Morris' promotion to full colonel notwithstanding the insistence of the U.S. Attorney for the Northern District of Texas that he be prosecuted. Although irrelevant to the Court's analysis, the Court does note that Morris was promoted to colonel subsequent to his acquittal.

the global community, to aid other charitable organizations to do the same, and to provide objective oversight in the establishment and enforcement of ethical standards within the humanitarian community. PIF has been recognized by the Internal Revenue Service as a 501(c)(3) organization; and it has been certified by the United States Aid Department as a legitimate international humanitarian assistance organization. Morris maintained an appropriate level of separation between his role with PIF and his duties as an Army officer, although his dual roles and interests put him in a unique position to benefit both organizations.

In 1997, PIF and the Muscogee Rotary Club decided to enter into a joint project to provide medical relief to the war-torn country of Rwanda. The Rwanda ambassador visited Columbus, the home of Fort Benning and the Muscogee Rotary Club, to make a plea for help. He indicated that the Rwandan government would commit over two million dollars toward constructing a much needed government hospital in Rwanda based in part upon the commitment of PIF and the Muscogee Rotary Club to provide medical supplies to his country.

In the summer or fall of 1997, Morris became aware of a large amount of Air Force excess medical property located in Albany, Georgia. The property was available through the Department of Defense ("DOD") excess system. Morris made two separate requests for lists of the available property, one on behalf of his Army battalion for use at Fort Benning and the other on behalf of PIF for humanitarian purposes. Morris navigated the government regulations pertaining to excess property as best he could in an attempt to secure medical supplies for Fort Benning. He planned to obtain any excess medical sup-

plies not needed by Fort Benning for PIF to be used for the Rwanda relief project. Based upon the government regulations, he ultimately concluded that to facilitate the transfer of property to PIF he needed to partner with another government agency, Indian Health Services ("IHS"), which was also interested in obtaining medical supplies for its use. Morris successfully obtained approximately half of the property, some of which was used at Fort Benning and the remainder of which was used by PIF and IHS.[7] Before PIF was able to ship the medical supplies to Rwanda, the Government executed search warrants for Morris' home and the warehouses containing the supplies. The Government subsequently indicted Morris for conspiring to steal government property.

The Government contended that Morris did not follow the government regulations for acquiring excess government property and unlawfully conspired with IHS and others to obtain the property for PIF. The indictment alleged that Morris knew that he was violating the government regulations and did so with criminal intent. Morris maintained his innocence with his attorneys arguing that the priority system outlined in the regulations permitted him to obtain the property for PIF as he had done. At worst, they argued, he may have inadvertently failed to follow the civil regulations precisely.[8] Morris' attorneys aggressively and effectively disputed the Government's claim that Morris had intentionally violated the regulations or conspired with anyone to illegally steal or convert government property.

Upon his acquittal, Morris filed a timely application for attorneys' fees and costs pursuant to the Hyde Amendment. He contends that the Government's prosecution was vexatious and/or frivolous. In

---

**7.** PIF ended up with the predominant share of the medical supplies.

**8.** Morris did not testify at trial, relying upon the presumption of innocence.

support of this assertion, Morris argues that the Government (1) failed to adduce any evidence of his criminal intent; (2) misrepresented certain key facts to the grand jury; and (3) engaged in vexatious and harassing conduct before and during his trial.

## DISCUSSION

### A. *18 U.S.C. § 3006A—The Hyde Amendment*

#### 1. *Background*

On September 24, 1997, Congressman Henry Hyde made an impassioned plea on the floor of the House of Representatives for the approval of an amendment to appropriations bill H.R. 2267, the adoption of which would provide reimbursement for legal fees and expenses incurred by individual persons who the government prosecuted without substantial justification. "If the Government, your last resort, is your oppressor," Hyde reminded his colleagues, "you really have no place to turn." 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997).[9] In a rhetorical flourish, Hyde asked, "What is the remedy, if not this, for somebody who has been unjustly, maliciously, improperly, abusively tried by the Government, by the faceless bureaucrats who hire a law firm or get a U.S. Attorney looking for a notch on his gun."[10] *Id.* at H7792.

The Hyde Amendment, as the proposed legislation came to be known, drew criticism from the Department of Justice, the Clinton administration, and certain members of Congress. Congressman David Skaggs, for example, expressed his concerns that prosecutors and their offices might be penalized for initially relying in good faith on evidence that later was suppressed or became otherwise unavailable. *Id.* at 7793. Hyde responded that Skaggs' concerns were already adequately addressed by the provision in the amendment vesting the power to award fees and expenses in the trial judge who initially heard the case. *Id.* Hyde argued that the trial judge would be aware of all the evidence at issue in the case, and if it were necessary to submit additional evidence, the court could hold an *in camera* review to protect any privacy interests involved. *Id.*

---

9. Congressman Hyde's comments echoed the sentiments of our founding fathers who clearly understood the need to limit the power of the government they were creating:

> If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions.

Federalist Paper No. 51, attributed to Hamilton or Madison (February 8, 1788).

Congressman Hyde's proposed amendment was intended as one of these "auxiliary precautions."

10. Hyde's proposed amendment was inspired by another amendment submitted for the House's consideration by Congressman John Murtha, which amendment would have allowed members of Congress and their staff to receive reimbursement for legal expenses incurred from prosecutions from which they prevailed. 143 *Cong. Rec.* H7791. Hyde believed that Murtha's amendment improperly limited the possibility of reimbursement to Congress and Congressional staff, and stated during the floor debate, "If [the amendment] is good enough for [members of Congress and their staff], it ought to be good enough for any citizen." *Id.* Hyde also thought Murtha's amendment "was too broad, because you only had to win your case to be entitled to attorney's fees .... What you need [according to Hyde] is to have a case that was not substantially justified, one that [the trial judge who heard the case determines] should not have been brought." *Id.*

The House of Representatives approved the Hyde Amendment by a margin of 340 votes to 84. *United States v. Gilbert,* 198 F.3d 1293, 1301 (11th Cir.1999); *see also* 143 Cong. Rec. H7849–01, H7849 (Sept. 25, 1997). However, the Clinton administration and the Department of Justice remained vehemently opposed to the amendment; additionally, the Senate declined to adopt the Hyde Amendment as it was then written. *Gilbert,* 198 F.3d at 1301. Faced with this resistance, the Conference Committee revised the amendment to allow recovery of legal fees and expenses only if "the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust." Pub.L. No. 105–119, 111 Stat. at 2519. The Conference Committee also shifted the burden of proof so that the individual would have to prove his or her claim by a preponderance of the evidence. *Gilbert,* 198 F.3d at 1302; *United States v. Adkinson,* 247 F.3d 1289, 1291 (11th Cir. 2001). This version of the amendment was enacted into law, and provides as follows:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust.

> Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

Pub.L. No. 105–119, 111 Stat. at 2519. "The [amendment's] plain language, reinforced by [its] legislative history ..., places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges." *Gilbert,* 198 F.3d at 1302–03.

#### 2. Statutory Requirements

To recover legal fees and expenses incurred to defend against government prosecution, a criminal defendant must prove by a preponderance of the evidence that "the position of the United States was vexatious, frivolous, or in bad faith."[11] Pub.L. No. 105–119, 111 Stat. at 2519. If the claimant meets this burden, the Court may, in its discretion, award attorney fees

---

**11.** To recover fees and expenses under the statute, the defendant must also show that (1) his trial occurred during fiscal year 1998 or later; (2) his net worth is less than two million dollars; (3) he was a prevailing party in his criminal case; (4) his attorney was not court-appointed; and (5) his attorney's fees and costs are "reasonable." Pub.L. No. 105–119, 111 Stat. at 2519; *Adkinson,* 247 F.3d at 1291 n. 2. It is not controverted that Morris meets these preliminary requirements.

and expenses so long as there are no special circumstances that would render such an award unjust. *Id.; Gilbert,* 198 F.3d at 1298.

 Morris concedes that the Government did not prosecute him in bad faith as that phrase has been defined in the context of the statute in question. He seeks recovery based upon the Government's prosecution allegedly being vexatious and/or frivolous. The terms "vexatious" and "frivolous" are not defined in the statute. Therefore, they should be construed in their ordinary sense. *Gilbert,* 198 F.3d at 1298. A vexatious position is one "without reasonable or probable cause or excuse." *Id.* (internal quotations omitted). Similarly, "frivolous" means "a [g]roundless [position] with little prospect of success; often brought to embarrass or annoy the defendant." *Id.* at 1299. (internal quotations omitted).

The courts have noted that the statute should not be used to penalize a prosecutor for zealously pursuing a conviction or arguing in good faith an issue of first impression. *Id.* at 1303. Instead, the law seeks to protect defendants from "prosecutorial misconduct, not prosecutorial mistake." *Id.* at 1304.

### B. *The Government's Alleged Vexatious and Frivolous Conduct*

 Morris asserts three basic grounds in support of his claim that the Government's prosecution of him was vexatious and frivolous: (1) the Government was unaware of and unable to produce any evidence that Morris possessed the requisite criminal intent to be guilty of a crime and yet pursued this prosecution; (2) the Government investigators misrepresented certain key facts to the grand jury, which indicted him in reliance upon these misrepresentations; and (3) the Government engaged in vexatious and harassing conduct before and during Morris' trial.[12]

The Court acknowledges that a strong argument can be made that appropriate prosecutorial discretion should have caused the Government to decline to prosecute this case. However, the Court finds that Morris' arguable expertise in the procurement of excess and surplus government property, his knowledge of the accompanying regulations, and the existence of some, albeit minimal, evidence that he violated those regulations provided the Government with sufficient circumstantial evidence from which the Government (and a jury) could infer criminal intent.[13] Although sympathetic to the injustice suf-

---

12. Morris' application is also based on the Government investigator's persistence in soliciting Morris' prosecution even when the military and the Middle District of Georgia U.S. Attorney's office declined to pursue charges against him. The Court rejects this argument by Morris and notes that the Assistant U.S. Attorney for the Middle District of Georgia has testified that his office declined to pursue the case primarily based upon administrative reasons.

13. Specifically, the Government alleged that Morris breached federal regulations by failing to turn in the property unused by Fort Benning to the Fort's Defense Reutilization and Marketing Office ("DRMO"). It was undisputed at trial that a significant portion of the property was not channeled through the DRMO. However, Morris' counsel argued that Morris' disposal of the unused property did not constitute a knowing breach of the regulations because he directly transferred it to another federal entity, Indian Health Services. The Government maintained that Morris' position with the Army and his experience in acquiring excess and surplus property should have indicated to him that the transfer to IHS was not permitted by the regulations. The Government thus theorized that Morris and Trujillo's plan to transfer Army property directly to IHS must have been a ruse knowingly designed to avoid compliance with the government regulation and to steal or convert the property.

fered by Morris because of the Government's ill-advised prosecution, the Court cannot conclude that Morris has carried his burden of establishing by a preponderance of the evidence that the Government's decision to prosecute him was clearly precluded by binding Eleventh Circuit precedent, groundless or without reasonable excuse. Accordingly, Morris has failed to establish that the Government's conduct in pursuing its prosecution of him was frivolous or vexatious.

■ Morris next argues that the Government's conduct before the grand jury was improper and supports an award of fees and expenses. Specifically, Morris claims that the Government case agent provided the grand jury with an inaccurate interpretation of the property disposal regulations that were in effect at the time of the alleged conspiracy and misled the grand jury as to the Army's response to Morris' criminal investigation. A review of the transcript of the grand jury proceedings arguably discloses inconsistencies between the Government agent's grand jury testimony and the evidence presented at trial. However, the agent's testimony was reasonably consistent with the allegations contained in the Government's indict-

ment. Moreover, the Court does not find that the agent knowingly provided false testimony to the grand jury or that the inaccurate statements in the indictment were knowing misrepresentations by the Government. The statute in question does not permit a criminal defendant to benefit from the Government's careless drafting of its indictment or lack of preparation in presenting its case to the grand jury. The evidence before the Court does not support a finding that the Government's presentation to the grand jury constitutes inexcusable or groundless conduct.

■ Finally, Morris complains that the Government's conduct in issuing approximately 200 subpoenas and listing over 1800 documents as potential exhibits, as well as its conduct throughout the course of the trial, came "right up to the line between 'vexatious' and 'in bad faith.'"[14] (Mot. at p. 15). The Court fully agrees with Morris' assessment that the Government's case sorely lacked focus or coherency.[15] However, as previously noted, the Court finds the Government's decision to prosecute, although unwise, was not vexatious or frivolous. Likewise, the Court finds the Government's trial performance to have been substandard but not vexatious or frivolous.[16]

---

14. Morris has conceded that the Government did not act in bad faith.

15. The Court observes that Morris likely benefitted from the Government's woefully inadequate presentation of its case, which undoubtedly contributed to his lightning fast acquittal. Morris' admittedly unintended implication that the Government should have prosecuted him more effectively reminds the Court of the moral of the Aesop's Fable "The Old Man and Death:" "We would often be sorry if our wishes were granted."

16. An undercurrent flowing throughout the Government's response to Morris' application suggests that the Government was treated unfairly at trial and that the Court's alleged erroneous exclusion of certain evidence contributed to the Government's defeat. Specifically, the Government argues that the Court

erred in excluding the statement one of its agents obtained from Morris' co-defendant Trujillo, which could be interpreted to contain an admission by Trujillo that he was aware he engaged in illegal conduct with Morris. The Court initially concluded that this alleged admission contained in the statement was admissible. However, the Court likewise found that other portions of the statement which were exculpatory should be admitted and that the alleged incriminating admission should not be considered without allowing the jury to consider the statement in its entirety. Unfortunately for the Government, the exculpatory portions of the statement contained alleged statements by Morris to Trujillo. Therefore, the introduction of those portions of the statement would have violated Morris' constitutional rights under Bruton and its progeny. *See Bruton v. United States,* 391 U.S. 123, 88

**1208**

## CONCLUSION

The Government's prosecution of Morris unnecessarily impugned the integrity of a well respected Army officer, embarrassingly diminished the credibility of the prosecutorial arm of the United States government (at least in the eyes of twelve fair and impartial jurors), and regrettably wasted substantial judicial resources. Nevertheless, under the legal standard that this Court is duty bound to follow, the Court cannot find that the Government's conduct was so vexatious or frivolous that Morris is entitled to recover his attorneys' fees and expenses. Accordingly, Morris' application must be, and is hereby, denied.[17]

S.Ct. 1620, 20 L.Ed.2d 476 (1968). Consequently, the Court excluded the statement. The Court found the Government's desperate arguments at trial unpersuasive and finds the Government's continued insistence that the statement should have been admitted frivolous. The "completeness doctrine" associated with the confrontation clause of the Constitution required that the exculpatory portion of the statement be admitted from Trujillo's perspective. *See, e.g., United States v. Lopez,* 898 F.2d 1505, 1510–11 n. 11 (11th Cir.1990); *see also* 21 Wright & Miller, Federal Practice & Procedure § 5077 (2003). However, *Bruton* makes it clear that Morris' alleged comments contained in the statement could not be admitted against Morris. The Government's

whining to the contrary is particularly unseemly given the fact that it could have easily avoided this dilemma by seeking to try Trujillo and Morris separately.

17. The Court's observations regarding the Government's performance in this case are not intended to besmirch the professional reputations of the Assistant U.S. Attorneys who tried this case. However, in their attempt to "make a silk purse out of a sow's ear," they somehow lost sight of the objective—justice. They will lick their wounds and fully recover. Because of the strict requirements for recovering fees and expenses, Lt. Colonel Morris, an innocent (and now financially poorer) man, may not.