**UNITED STATES of America,**

v.

**Jeffrey SCHNEIDER, Defendant.**

**No. 02–CR–0128 (DRH).**

United States District Court,
E.D. New York.

Nov. 3, 2003.

---

Roslynn R. Mauskopf, United States Attorney, Eastern District of New York, Central Islip, NY, by Richard P. Donoghue, Assistant United States Attorney, for the Government.

Kase & Druker, Counsellors at Law, Garden City, NY, by James O. Druker, for Defendant.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before me is the motion of Jeffrey Schneider ("Schneider" or "defendant") "for an Order, pursuant to the Hyde Amendment, 18 U.S.C. § 3006A, granting a prevailing defendant attorney's fees and expenses against the Government for its bringing of a vexatious, frivolous and bad faith prosecution." Notice of Motion at 1, 2.

## BACKGROUND

On October 24, 2002, a jury acquitted Schneider of the charges in the captioned indictment, to wit conspiracy to commit wire and securities fraud (Count One), and wire fraud (Count Two). The verdict was returned after approximately three and a half hours, "of which a portion was consumed by a half hour fire drill and several read backs of testimony." James O. Druker, Esq. Aff., ¶ 58. Defense counsel reports that his post verdict discussion with the jurors, as well as his conversation with the alternate juror who had been earlier excused, indicated that they were "outrage[d] that Mr. Schneider had been prosecuted." *Id.,* ¶ 59.

As is explained in greater detail, *infra,* defense counsel argues that the returning of the indictment, and the subsequent prosecution through to verdict, are traceable to "the Government['s] ... animus arising from Mr. Schneider's refusal, on advice of counsel, to sign a proffer agreement and to cooperate with the prosecutors." Id. ¶ 2.

## THE HYDE AMENDMENT

The Hyde Amendment provides, in pertinent part, as follows:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith unless the court finds that special circumstances make such an award unjust.... To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal.

Pub.L. 105–119, Title Vi, § 617 November 26, 1997, 11 Stat. 2519.

## APPLICABLE LAW

To prevail, defendant must establish, by a preponderance of the evidence, that the government's prosecution was vexatious, frivolous or pursued in bad faith. *United States v. Manchester Farming Partnership*, 315 F.3d 1176, 1182 (9th Cir.2003). The Hyde Amendment must be strictly construed in that it involves a waiver of sovereign immunity. *United States v. Knott*, 256 F.3d 20, 27 (1st Cir. 2001). Moreover, a "presumption of regularity supports ... prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

In determining whether a defendant has carried his or her burden of proof with respect to a Hyde Amendment claim, the government's action must be viewed "from a perspective of the government *at the time*" *Knott*, 256 F.3d at 35, rather than with the power of "twenty-twenty hindsight based solely on reasonableness," *United States v. Sherburne*, 249 F.3d 1121, 1127 (9th Cir.2001). "The [Amendment's] plain language, reinforced by [its] legislative history ..., places a daunting obstacle before defendants seeks to obtain attorneys fees and costs from the government following a successful defense of a criminal charge." *United States v. Gilbert*, 198 F.3d 1293, 1302–03 (11th Cir.1999).

With the above principles in mind, attention will now be turned to the question of whether movant has established that the prosecution in this case was frivolous, vexatious or conducted in bad faith.

## DISCUSSION

### 1. *Prosecution was not Frivolous*

The term "frivolous," like the Hyde Amendment's other two disjunctive terms, viz., "vexatious" and "bad faith," are not defined in the statute. The terms, however, have been judicially defined.

"A 'frivolous action' is one that is '[g]roundless ... with little prospect of success; often brought to embarrass or annoy the defendant.'" *United States v. Gilbert*, 198 F.3d at 1299, (quoting Black's Law Dictionary 668 (6th ed.1990)); *see also United States v. Braunstein*, 281 F.3d 982, 995 (9th Cir.2002) and *In re 1997 Grand Jury*, 215 F.3d 430, 436 (4th Cir. 2000).

Defendant maintains that "the frivolous character of [subject prosecution] is abundantly clear" in that "[t]he four primary witnesses against [him] were the individuals with the greatest culpability in the case [each of whom] was simply not credible." Def.'s Mem. Supp. at 5.[1]

Defense counsel probably is correct that the government failed to prove its case because the jury disbelieved the government's cooperating witnesses. It is suggested by the defense that each of those witnesses was unworthy of belief as a matter of law given his dubious character and strong motives to fabricate. But the government is often saddled with such witnesses in criminal prosecutions and juries are called upon to sift through the testimony to determine if, notwithstanding the witnesses' shortcomings, the information furnished is truthful. That the jury in this

---

1. Essentially the same argument was made by defendant in his application for judgment as a matter of law pursuant to Fed. Rule of Crim. P. 29. Trial Transcript ("Tr.") at 696–697. That motion was denied because the testimony adduced by the government, if accepted by the trier of fact, was sufficient to satisfy each element of the conspiracy and wire fraud crimes charged.

case determined that it was not and, accordingly, returned a not guilty verdict does not render the case frivolous for purposes of the Hyde Amendment.

Numerous government witnesses fully implicated the defendant in the crimes charged in the indictment. Their testimony, if believed, would have resulted in his conviction. Indeed, defense counsel underscored the critical importance of witness credibility during his closing argument to the jury. Tr. at 1022 ("If you believe Mr. Casuccio that they were all talking about the float and that he told Jeffrey in some words or manner that there was fraud going on and if you believe him beyond a reasonable doubt, then you are going to convict Jeffrey.").

In sum, the government presented more than adequate proof to convict defendant. That the key government witnesses did not fare well on the stand, particularly during cross examination, does not render the government's case "groundless ... with little prospect of success." Defendant has failed to establish that the government's prosecution was frivolous.

### 2. *Prosecution was not Vexatious*

"As the Ninth Circuit has made clear 'vexatious' has both a subjective and objective element; subjectively the government must have acted maliciously or with an intent to harass the Defendant; objectively, the action must be deficient or without merit." *United States v. Holstrom,* 246 F.Supp.2d 1101, 1108 (E.D.Wash.2003), citing *Sherburne,* 249 F.3d at 1126–1127. *See also United States v. Knott,* 256 F.3d 20, 29 (1st Cir.2001) ("We hold that a determination that a prosecution was 'vexatious' for the purpose of the Hyde Amendment requires both a showing that the criminal case was objectively deficient, in that it lacked either legal merit or factual foundation, and a showing that the gov-

ernment's misconduct, when viewed objectively, manifests maliciousness or an intent to harass or annoy.").

■ For defendant to prove that the prosecution was vexatious, both elements must be established. The element pertaining to the prosecution's motivation is in large measure intertwined with the last of the three disjunctive predicates for Hyde Amendment liability, that being "bad faith." Accordingly, the Court will simply discuss whether the government's case was objectively deficient in this portion of the opinion.

As noted previously, the government had more than adequate evidence to establish each element of the two crimes of which defendant stood accused. Granted, the strength of the government's case was linked, as is often the case, to the jury's credibility determinations vis-a-vis the government's key witnesses. That circumstance, viewed pre verdict, does not undermined either the legal merit or factual foundation for the prosecution. Which is to say, defendant has failed to establish that the prosecution was vexatious.

### 3. *The Prosecution was not Undertaken and Pursued in Bad Faith*

#### A. *Definition of Bad Faith*

■ Bad faith " 'is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will.' " *United States v. Gilbert,* 198 F.3d at 1299 (quoting Black's Law Dictionary 139 (6th ed.1990)).

#### B. *Origin of Dispute*

From the materials submitted, it appears that the origin of this claim is to be found in the collogue that occurred be-

tween AUSA Jodi L. Avergun ("Avergun") and defense counsel James O. Druker ("Druker") during an initial proffer session held on December 22, 2000. That session began with prosecutor advising defense counsel that Schneider was not a mere fact witness but rather was a "target or subject" of the investigation. Druker Aff. at ¶ 16. In a letter written to Avergun on the same day as the proffer session, Druker provides his perception of the subsequent events of that day thusly:

At today's meeting, I declined to sign the proffer agreement that contained new language I considered to be inappropriate. I offered to do a full attorney's proffer for you; you refused to accept. I told you that, in my opinion, Mr. Schneider has no criminal exposure and that he was an appropriate candidate for immunity. You told me that your office does not give immunity "without talking to people first." You then informed me that if we did not go through with the proffer, you would "subpoena Mr. Schneider into the grand jury and, if he takes the Fifth Amendment, we will then prosecute him." I told you that I felt that you were out of line in suggesting that someone with no criminal exposure would be prosecuted for exercising his Fifth Amendment privilege; you then told me that I could take the far door to leave.

Mem. Supp., Ex. C. *See also* Druker Aff. ¶¶ 16, 17, 18, 19, and 20.

In reply, by letter dated December 27, 2000, Avergun states:

[P]lease be informed that your written summary of the events of December 22, 2000, which you have copied to the head of the Long Island Criminal Division, is incorrect in several respects. First and foremost, I did not threaten to prosecute your client IF he took the Fifth Amendment in the grand jury. The prosecu-

tion of Mr. Schneider would stem from the criminal conduct, including aiding and abetting mail fraud and securities fraud, in which your client appears to have engaged. I told you that if he did not choose to be proffered under the terms of our current proffer agreement, I would subpoena him to the grand jury where he would presumably take the Fifth Amendment. I also told you that an indictment could follow, but I am certain that I did not say that it would follow as a result of Mr. Schneider's asserting his right against self-incrimination. I even informed you of the name of one of the witnesses from whom I expected to obtain information about Mr. Schneider. However, in case I was not clear enough for you on December 22, 2000, please be assured that I will not prosecute Mr. Schneider merely because he asserts his Fifth Amendment privilege before the grand jury. I will assure myself and the grand jury that Mr. Schneider has engaged in violations of the federal criminal law before I seek to indict him, as it is my obligation to do.

Mem. Supp., Ex. F; *see also* Avergun Aff, Ex. 1 to Letter Br. Opp'n.

The apparently acrimonious session ended with the prosecutor stating to defendant that his attorney was providing him with bad advice.

### C. *Events Since Initial Proffer Session*

In his supporting affidavit, Druker chronicles a series of post December 22, 2000 letters exchanged between him, Avergun and other individuals in the United States Attorney's Office in which he requested that the grand jury subpoena for Schneider be served upon counsel rather than the client, and that Schneider be excused from appearing before the grand jury in view of the fact that he intended to invoke his privilege against self discrimina-

tion. It is undisputed that both those requests were granted, although the government indicates that Avergun extended the courtesies while the defense maintains that her then supervisor was responsible for the accommodations. In any event, Schneider never appeared before the grand jury and, accordingly, never invoked his Fifth Amendment privilege before that body.

Druker thereafter arranged for a conference to be held on January 18, 2002. The participants were the then Chief of the Criminal Division Jonathan Sack ("Sack"), Avergun and Druker.

Mr. Schneider was indicted on January 30, 2002, i.e., twelve days after the January 18th conference, and more than a year after the December 22, 2000 proffer session. Following the return of the indictment, Ms. Avergun accepted a position as the Chief of the Narcotics and Dangerous Drugs Section of the United States Department of Justice in Washington D.C. and was no longer employed by the United States Attorney's Office.

On June 28, 2002, the two new AUSAs assigned to the case, together with Schneider and Druker participated in a proffer session. The Court was then asked not to set a trial date as the parties were pursuing the possibility of a deferred prosecution. That possibility did not come to fruition because Sack declined to furnish the needed approval. Before making that decision, Sack conferred with the two newly assigned assistant AUSAs, as well as Avergun—even though she was no longer with the Office—"to help [him] understand the facts and evidence in the case and thereby determine what the appropriate course was to take." Sack Aff., Attach. Ex. 2 to Letter Br. Opp'n.

The defendant proffers, and the government does not dispute, that the two newly assigned AUSAs, together with the then head of the Long Island Office of the United States Attorney's Office were amenable to this case being the subject of a deferred prosecution or, possibly, a dismissal. Those individuals are not the targets of the present bad faith claim. Indeed, in defendant's view, "[t]hey did everything in their power to put an end to this prosecution, but were stymied by their 'front office.'" Mem.Law Supp. at 9.

### D. *Analysis of Bad Faith Claim*

■ The driving force behind this prosecution, in defendant's view, was Avergun. The transgressions ascribed to her by Druker include (1) "becom[ing] incensed when counsel directed Mr. Schneider not to engage in a proffer under unacceptable terms," (2) "falsely claim[ing] that certain language in the proffer agreement to which defense counsel objected was *mandated* by the Second Circuit," (3) "improperly address[ing] Mr. Schneider directly, criticizing his attorney," and (4) "threaten[ing] to indict him if he appeared before the grand jury and asserted his Fifth Amendment rights." *Id.* "All of these circumstances [are said] to show vindictiveness." *Id.* at 10.

Affidavits and other information cited by the defense, while sufficient to indicate that the December 22, 2000, proffer session was contentious and some utterances would have been better left unsaid, establish little more that is germane for present purposes. Significantly, it is undisputed that Avergun began the meeting by stating that Schneider was a target of the investigation. Which is to say, Schneider did not become a target because of what transpired thereafter. Also undisputed is Druker's dissatisfaction with the tendered proffer agreement and Schneider's concomitant decision not to cooperate. It is certainly not uncommon for a non-cooper-

ating target of a grand jury investigation to be indicted.

As noted, Druker recalls Avergun saying that if Schneider invoked the Fifth Amendment before the grand jury, he would be indicted. Assuming that was said, Schneider was not called to testify. Instead, the grand jury subpoena was recalled at defense counsel's request. So the condition precedent to the purported threat being implemented never occurred.

Perhaps, it could be argued that Druker's representation that his client would invoke his privilege against self incrimination were he to be summoned before the grand jury is what triggered the indictment. But the reasonableness of such a speculative argument is belied by the attendant circumstances, including (1) Schneider was a target of the investigation (2) from the trial, at least, we know the government had documentary and testimonial evidence implicating him in the suspected wrongdoing and (3) he elected not be appear before the grand jury to present his position for its consideration. Given that scenario—he, like anyone else in a comparable situation—could expect to be indicted.

And even if the AUSAs assigned to the case after Avergun left the Office, together with the head of the Long Island Office, were of the view that defendant should be offered a deferred prosecution or, conceivably, a dismissal of the charges, the final decision was not theirs to make. Rather, the responsibility rested with Sack, as the Chief of the Criminal Division. He avers that it was his decision alone after receiving input from the previously noted assistants, as well from Avergun as the former assistant who had the most extensive contact with the case. There is no evidence to suggest that Sack's decision was motivated by personal animus towards Schneider or Druker.

## E. *Defendant's Requests for Discovery and a Hearing to Expand the Record on Bad Faith*

The proposition that Avergun caused the case to go to trial, notwithstanding Sack's uncontroverted statement to the contrary, is the product of speculation. Implicitly, that speculation is recognized by the defense. Indeed, seemingly is the reason that the defense seeks to expand the record by asking the Court to review, ex parte and in camera, all written communications between and among the various AUSAs who evaluated the strengths and weakness of the case and/or ventured an opinion whether it should be tried or otherwise resolved. I have also been asked to hold a hearing so that, inter alia, those AUSAs, or some of them, may be subjected to cross examination. Not surprising, both requests are opposed by the government.

It is the government's position that the Hyde Amendment does not authorize the compelled production of privileged government documents for in camera review. "As the [statute's] plain language indicates, the provision permitting ex parte and in camera review is designed to permit the government to provide the court with documents containing sensitive information such as classified evidence, to rebut allegations that its prosecution was vexatious, frivolous, or pursued in bad faith." Letter Br. Opp'n at 5.

The government cites *United States v. Truesdale*, 211 F.3d 898 (5th Cir.2000), in support of its position. In *Truesdale*, the Fifth Circuit stated "the provision for in camera review of evidence was included to enable the government to defend itself against Hyde Amendment motions and at the same time protect confidential information." 211 F.3d 898, 907 (5th Cir.2000). However, the purpose for the inclusion of

the in camera statutory provision arguably does not preclude such a review being conducted at the request of the defense. *United States v. Lindberg*, 220 F.3d 1120, 1126 (9th Cir.2000) ("The Hyde Amendment allows the district court to order the production of documents 'for good cause shown.'"); *United States v. Gardner*, 23 F.Supp.2d 1283, 1296 (N.D.Ok.1998). In any event, the Court assumes the requested review may be undertaken if the appropriate threshold showing has been established. That threshold, whether the items are delivered to the Court (or, parenthetically, to the defense) is necessarily high because the attorney work product and the deliberate process privileges are both implicated. *Cf. Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) ("work product protects mental processes of the attorneys while deliberate process covers documents reflecting advisory opinions, recommendations and deliberations comprising part of the process by which governmental decisions and policies are formulated. The deliberative process privilege rests on the on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery....").

■ In *United States v. Armstrong*, 517 U.S. at 459, 116 S.Ct. 1480 (1996), defendants, who were indicted for selling crack cocaine and using a firearm in connection with drug trafficking, moved for discovery on their race-based selective prosecution claim. After the Court explained the inapplicability of Federal Rule of Criminal Procedure 16 (given that a selective prosecution claim is not a defense on the merits to the criminal charge), reference was made to the presumption of regularity afforded to prosecutorial decisions. In so doing, the Court underscored

that the standard for discovery was a "demanding one" given that the claim of selective prosecution "asks the Court to exercise judicial power over a 'special province' of the Executive." *Id.* at 463–64, 116 S.Ct. 1480. To obtain discovery, defendant must show at least "'some' evidence of discriminatory effect and intent." *Cf. United States v. Alameh*, 341 F.3d 167, 173 (2d Cir.2003).

Although the selective prosecution claim in *Armstrong* arose from the equal protection clause of the Fifth Amendment, as distinct from being statutorily based, the same rationale vis-a-vis a well grounded reluctance to probe prosecutorial decisions applies to Hyde Amendment claims.

In *United States v. Sanders*, 211 F.3d 711 (2d Cir.2000), the Circuit addressed discovery in a vindictive prosecution context. It applied the same rigorous discovery standard enunciated in *Armstrong* for a selective prosecution claim, explaining that "[w]hether a defendant claims selective prosecution or vindictive prosecution, '[e]xamining the basis of a prosecution ... threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.'" *Id.* at 717. The same concerns are implicated by a Hyde Amendment discovery request. And that is so whether the discovery request calls for production to the defense or to the Court although the level of concern is considerably lessened under the latter circumstance.

The formidable challenge faced by defendant is further evidenced by a review of discovery decisions in death penalty cases. *See United States v. Fernandez*, 231 F.3d 1240, 1246–47 (9th Cir.2000) (Government's death penalty evaluation form and prosecution memoranda shielded by the attorney work product and deliberative process

privilege and thus non discoverable); *United States v. Perez,* 222 F.Supp.2d 164, 172 (D.Conn.2002); *United States v. Frank,* 8 F.Supp.2d 253, 284 (S.D.N.Y. 1998) ("prosecutors are encouraged and required to evaluate carefully the strengths as well as the weakness of their cases.... Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision ....")

 Defendant has not made the threshold showing necessary for the Court to conclude that the government's attorney work product and deliberative process privileges should yield to his discovery demands. The information before the Court which bears on defendant's discovery request has already been outlined. That information is meager, consisting primarily of a contentious proffer session, supplemented by surmise. It fails to satisfy the discovery standard articulated in *Armstrong,* as that standard is explained by the Second Circuit in *Alameh.* The same rationale applies to his application for a hearing.

### F. *Conclusion re Defendant's Bad Faith Claim*

Defendant has not presented "clear evidence" sufficient to overcome the presumption of regularity which attaches to the government's decision to seek an indictment against him—as a non-cooperating target of the grand jury investigation—and to take the case to trial. *Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480. That the power of hindsight suggests it might have been wise to pursue another course of action is interesting but largely irrelevant. *Cf. United States v. Morris,* 248 F.Supp.2d 1200 (M.D.Ga. 2003).

### CONCLUSION

Defendant was well represented at trial and obtained a favorable result. But, as noted earlier, the Hyde Amendment's "plain language, reinforced by its legislative history ..., places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges." *Gilbert,* 198 F.3d at 1302–03. As to defendant's claim that the current prosecution was frivolous, vexatious and in bad faith, his efforts fall well short of clearing the obstacle. Accordingly, his application is denied *in toto.*

SO ORDERED.